[No. D057195. Fourth Dist., Div. One. Dec. 17, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN PAUL NELSON, Defendant and Appellant.

[No. D057198. Fourth Dist., Div. One. Dec. 17, 2010.]

In re JOHN PAUL NELSON on Habeas Corpus.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Discussion parts I.C., II., III., IV., V., and VI.

COUNSEL

Lynda A. Romero and George L. Schraer for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Angela Borzachillo, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HALLER, J.—In his appeal and habeas corpus petition, John Paul Nelson challenges his conviction of premeditated attempted murder with a finding that he personally discharged a firearm. In the published portion of this opinion, we reject defendant's contention that his constitutional right to confront witnesses, as defined in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), was violated by the admission of the victim's out-of-court statement identifying defendant as the perpetrator. We hold the victim's brief informal statement, made on the night of the shooting in an ambulance when the victim was close to death, was not

testimonial. Hence, admission of the statement did not contravene defendant's rights under *Crawford*.

In the unpublished portion of this opinion, we address defendant's other assertions of error, including erroneous admission of uncharged misconduct and bad character evidence; a violation of the *Doyle*[1] rule precluding reference to post-*Miranda*[2] silence; closing argument references to facts not in evidence; and inadequate cross-examination of a key prosecution witness. We find no reversible error, and accordingly affirm the judgment and deny the habeas corpus petition.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

About 10:00 p.m. on February 2, 2004, Anthony Marquez was shot in the stomach while he was standing at the bottom of a driveway. After he was shot, Marquez ran to the door of Joanna Oyler's apartment and collapsed. In a recorded interview with the police on February 19, 2004, Oyler identified defendant and another man (Edward Gordin) as being in a car in the driveway at the time of the shooting. Defendant and Gordin were arrested and charged with premeditated attempted murder.

When interviewed by the police, Gordin initially denied involvement in the shooting, telling the police that the "word . . . on the street" was that defendant and another man were responsible for the shooting. After the police described facts linking Gordin to the crime, Gordin admitted he was the driver of the car and stated defendant was the shooter.

A police officer who arrived at the scene in response to a 911 call testified he found Marquez lying on the ground in front of an apartment. When the officer asked Marquez what happened, Marquez stated he had been shot. Marquez said he had been standing outside at the entrance to the property when a car pulled up and he was shot. When the officer asked who shot him, Marquez told the officer he was shot by "an unknown subject from that vehicle." A firefighter who accompanied Marquez in the ambulance on the

---

[1] *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] (*Doyle*).

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

[3] Defendant has raised numerous contentions by means of an appeal and petition for writ of habeas corpus. We issued an order to show cause in the habeas corpus proceeding and have received a return and traverse from the parties. The issues on appeal and in the habeas corpus proceeding are interrelated, and accordingly we have consolidated the matters and consider the issues together. To the extent defense counsel did not object to the errors at trial, defendant challenges them on ineffective representation grounds in his habeas corpus petition.

way to the hospital testified that when he asked Marquez who shot him, Marquez responded "John Paul" (i.e., defendant).

On the eve of trial, Gordin pleaded guilty to attempted murder (without premeditation) and then testified on behalf of the prosecution. Gordin testified he had met defendant "on the streets" a couple of weeks before the shooting. Gordin, along with defendant, Marquez, and other people, would "hang around" at Oyler's home to use methamphetamine. Gordin had known Marquez since they were young boys, and their fathers were good friends.

Gordin testified that on the night of the shooting, he was at Oyler's apartment with several other people, and defendant was at the next-door duplex. A stolen Honda was parked at Oyler's residence. Defendant came to Oyler's apartment and asked for a ride. Gordin agreed to give him a ride; they got inside the Honda with Gordin in the driver's seat and defendant in the passenger's seat. Gordin drove to the bottom of the driveway and stopped, with the car facing the street.

While Gordin was waiting for a car to pass before driving onto the street, defendant asked "who's that?" Gordin glanced over to the passenger side and saw a shadow of someone walking towards the car, but he could not see who it was because it was dark. Gordin noticed that defendant was "digging around" in his pockets for something. Gordin turned back and focused his attention on the car coming down the street, and then he heard a gunshot. Gordin saw defendant bring his arm back in through the open car window, and saw that he was holding a gun.

After shooting the gun, defendant stated, " 'I got that fool.' " Gordin asked " 'Who?,' " and defendant stated "Anthony" (i.e., Marquez). Gordin, feeling angry and panicked, stated " 'What the fuck?' " and rapidly drove off. Defendant responded, " 'Sorry, dog, I had to do what I had to do.' " Gordin wanted to get away from defendant; he drove several blocks away from the scene and then left defendant in the car.

Gordin testified he felt angry when defendant told him it was Marquez, because Marquez had never done anything to Gordin and Gordin and Marquez had always been friends. Gordin knew that the people he "hung around" with on the streets were saying Marquez was a snitch who had talked to the police about people doing crimes, but Gordin did not believe it. Gordin testified that if you are a snitch, people want to kill you, and the only reason he could think of for defendant to shoot Marquez was because defendant thought Marquez was a snitch.

Gordin testified he was afraid because he understood that he was now labeled as a snitch and would have a difficult time in prison because of this. He stated defendant's sister had threatened to "do something to" his sisters if he "snitched" on defendant, and his family was trying to move to a different location.

Oyler testified during the prosecution's case, but denied or claimed not to remember essentially all of the matters she told the police that implicated Gordin and defendant in the shooting. Accordingly, the prosecutor was allowed to play a recording of her interview with the police.

In that interview, Oyler stated that at the time of the shooting she had known Gordin about four to six months and he was her friend, whereas she had known defendant only about two months. Just before the shooting, Oyler was standing inside the screen door of her home smoking a cigarette. She saw Gordin and defendant in a Honda car in the driveway by her house; Gordin was driving and defendant was in the front passenger seat. They drove down the driveway and stopped the car by the street. Oyler then heard a gunshot. Marquez ran to her door, holding his stomach and screaming that he had been shot and to call 911. Oyler heard the Honda speed away. She called 911.

Oyler told the police that from her front door she could not fully see the area in the front of the property. Further, she did not see Marquez until he was running towards her apartment after being shot. She also told the police that she thought that at the time of the shooting Marquez was "walking this way[,] towards [defendant] to the passenger seat," and so she "guess[ed]" defendant was the shooter. She heard that the shooting occurred because Marquez was a snitch. Oyler stated that she had seen defendant with a gun, apparently on the night of the shooting.[4] She did not see Gordin with a gun the night of the shooting, although she saw him with a gun after the shooting (about one week before the police interview).

When the police told Oyler that Gordin had been bragging that he was the shooter and asked if Gordin had told her this, Oyler responded yes. Oyler stated that Gordin had told her "he had the gun and he shot" Marquez because Marquez was a snitch. Oyler opined that Gordin was saying this because he was afraid; he wanted people to think he was "tough"; and he thought that if he put "this reputation out there that he's such a bad ass" then people would leave him alone and be afraid of him. Oyler told the police that

---

[4] The transcript of the recorded interview states that when Oyler was asked if she saw defendant with the gun on "[t]hat same night," she answered, "Mmm-hmm."

people got shot for "telling on people" and she did not want to testify. She stated she was not afraid of Gordin and Gordin would not shoot anyone, but she was afraid of defendant because she did not really know him and she heard "bad things" about him and that he would "take you out in a second."

A knife was found in the driveway where the shooting occurred, and a knife sheath was found in Marquez's possession. The officer who found the knife in the driveway testified the knife would have been closer to the driver's side than the passenger side of a vehicle that was facing the street to exit the driveway. The police assessed that because of a heavy rain that started shortly after the shooting, physical evidence (such as blood) that might have assisted the investigation of the crime was washed away.

In addition to evidence concerning the shooting, the prosecutor introduced several items of uncharged misconduct committed by defendant, including (1) defendant's threat to kill his girlfriend's family if his girlfriend's stepfather reported him to the police for beating the girlfriend; (2) defendant's high-speed evasion of the police when the police responded to a disturbance report at the hotel where his girlfriend's family was staying; and (3) defendant's assault on an inmate (Willie Pullins) when defendant was in a holding cell several years after the shooting.

The jury found defendant guilty of attempted premeditated murder with a personal gun discharge finding. For the attempted murder conviction, he was sentenced to life with the possibility of parole. He also received a determinate term of 20 years for the personal gun discharge enhancement.

## DISCUSSION

### I. *Admission of Victim's Hearsay Identification of Defendant*

Defendant asserts the victim's hearsay statement that he shot the victim should not have been admitted into evidence. He contends: (1) the statement is testimonial and hence its admission violates his federal constitutional right of confrontation as defined in *Crawford*, and (2) the statement cannot be characterized as a spontaneous statement admissible under California's hearsay exceptions. We reject these contentions.

#### A. *Pretrial Hearing on Admissibility*

Before trial, the prosecutor told the court that the victim would likely not be testifying, explaining: "[D]espite our best efforts to find and secure his availability, I don't think the victim in this case will be made available to

testify." The prosecutor moved to allow into evidence the victim's hearsay statement made in the ambulance that he was shot by "John Paul." The prosecutor argued the statement did not violate the defendant's right to confront witnesses under *Crawford* because the statement was nontestimonial, and the statement was admissible under the spontaneous statement exception to the hearsay rule.

At a hearing to determine the admissibility of the victim's statement, the prosecutor presented the testimony of a police officer (Mark Smith) who spoke with the victim at the scene of the shooting, and the testimony of firefighter Bradley Witt who spoke with the victim in the ambulance. Smith testified that when he arrived at the scene about 10:00 p.m. in response to a 911 call, Marquez was lying on the ground by the front door of a duplex. Marquez was holding a bloody towel to his abdomen. Smith spoke to Marquez for about one or two minutes. Marquez was "very low key and quiet" when he was talking. Marquez told Smith he had been shot "out front" on the street, and the assailant was in a vehicle and used a "large handgun." When Smith asked Marquez who shot him, Marquez told Smith that "an unknown subject shot him."[5] When Smith asked Marquez to describe the shooter and to describe the car, Marquez did not respond to either question. Smith did not ask Marquez any more questions because he felt he was not going to get any more information from Marquez at that point.

The prosecutor asked Smith if he was concerned about whether the shooter might be near the area at that time. Smith responded, "Yes, that's always a concern." After speaking with Marquez, Smith started examining the crime scene to determine exactly where the shooting occurred so the area could be contained. Smith testified that he did not obtain information about the identity of the shooter until later that night.[6]

Firefighter Witt testified that when he arrived at the scene of the shooting, he assisted the ambulance crew with placing Marquez on a backboard and into the ambulance. Witt stated that it typically takes about six to 10 minutes to accomplish this task. Witt accompanied the paramedic in the back of the

[5] The terminology "unknown subject" was derived from the language used by Smith in his police report to describe Marquez's response.

On direct examination at the pretrial hearing, Smith testified that Marquez did not respond when asked who shot him. However, when shown his police report on cross-examination, Smith clarified that Marquez indicated he did not know who shot him, and that he did not respond when asked to describe the shooter.

[6] Smith testified at the pretrial hearing that he did not interview other persons at the scene. However, at trial, another officer testified that he interviewed the other people at the scene, apparently with no discovery of the identity of the shooter.

ambulance and during the ride to the hospital assisted with monitoring Marquez's vital signs and providing him oxygen. About midway through the 15- to 20-minute ride to the hospital, Witt asked Marquez, " 'Who shot you?' " Marquez responded, "John Paul." The answer stood out in Witt's mind because John Paul is the name of a famous pope and Witt is Catholic. Witt testified that while in the ambulance Marquez was in critical condition; he was fading "in and out of consciousness"; he was having difficulty breathing; and he was bloated and having severe abdominal pain. The police had not asked Witt to question Marquez, but he asked Marquez who shot him because he was concerned that Marquez was going to die. Witt acknowledged that the question had no relevance to Marquez's medical condition. Witt did not ask Marquez any additional questions because they were busy treating him.

Witt stayed at the hospital for a while, and arrived back at the fire station about 12:30 a.m. He testified he called the police department "right when [he] got back" to the station and provided the name given by Marquez.[7] He thought this was "good information" for the police to know, and he called when it was "fresh . . . in [his] head."[8]

With respect to the *Crawford* right of confrontation, the prosecutor asserted the victim's statement to Witt identifying the shooter was nontestimonial because Witt was not a law enforcement agent charged with investigation of crime, and there was no structured questioning akin to a police interview. With respect to California's hearsay rules, the prosecutor argued the statement to Witt was a spontaneous statement "because it was made under the stress of the event."

Objecting to admission of the statement to Witt, defendant asserted the statement was testimonial because Witt was not obtaining information about Marquez's physical condition but rather was acting as an agent of the police to obtain information about the suspect. Further, defendant argued the statement to Witt was not spontaneous because Marquez had time to reflect

---

[7] In his trial testimony, Witt estimated about 60 to 90 minutes passed between the time the victim made the identification statement and the time he called the police department to relay the information.

[8] On cross-examination in his trial testimony, Witt stated he did not immediately call the police when the victim made the identification statement in the ambulance because during the entire ambulance ride he was "busy . . . [¶] [t]aking vitals" and providing "patient care." He acknowledged that once the victim was situated at the hospital, he could have used his cell phone to call the police before he arrived back at the fire station. He testified he was "not concerned at that time" that the shooter "was still around," but he was concerned about the shooter's identity. He also testified that when he arrived back at the fire station he "immediately" called the police.

before making the statement, as shown by the fact that he had earlier stated to Officer Smith at the scene that an "unknown subject" shot him.

The trial court ruled the statement to Witt was nontestimonial because of the circumstances under which it occurred. Further, the court ruled the statement was admissible as a spontaneous statement because Marquez had been shot in the stomach, he was still in a state of shock, and he did not have "time to process the information." The court reasoned that given Marquez's critical condition, he would not be "trying to figure out . . . who should I pin this on."

## B.   Crawford *Right of Confrontation*

### 1.   *Governing Law*

The Sixth Amendment of the federal Constitution provides that a defendant has the right to confront the witnesses against him. In *Crawford*, the United States Supreme Court held that admission of a "testimonial" hearsay statement by a declarant who does not appear for cross-examination at trial violates the confrontation clause unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. (*Crawford, supra,* 541 U.S. at pp. 59, 68.) This rule applies even if the statement is otherwise admissible under a hearsay exception. (*Id.* at pp. 50–51, 56 & fn. 7.) However, the confrontation clause does not bar admission of hearsay statements that are not testimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 823–826 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*).)

Relevant to the parameters of testimonial statements to which the confrontation clause applies, *Crawford* explained: "[T]he Confrontation Clause . . . applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' . . . 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford, supra,* 541 U.S. at p. 51, second bracket in original.)

However, not all statements to government officers are testimonial. In *Davis*, the court formulated the following test to distinguish nontestimonial from testimonial statements made to law enforcement officials: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such

ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, 547 U.S. at p. 822.)

The *Davis* court reasoned that statements to government officials that are "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" satisfy the definition of a testimonial statement because they are a solemn declaration or affirmation made for the purpose of establishing or proving some fact. (*Davis, supra*, 547 U.S. at p. 826.) Further, a witness's description of past events to an investigating officer may be testimonial regardless of whether the statements were reduced to a writing signed by the declarant or merely embedded in the memory or notes of the officer. (*Ibid.*) *Davis* acknowledged that "formality is indeed essential to testimonial utterance," but stated the requisite formality and solemnity exist when a witness describes past events to an officer, because deliberate falsehoods to officers constitute a criminal offense. (*Id.* at pp. 826–827, 830, fn. 5.) *Davis* also observed that even when statements were made without any detailed interrogation (i.e., volunteered statements or answers to open-ended questions), this does not automatically make them nontestimonial. (*Id.* at p. 822, fn. 1.)

■ Under these principles, statements made to a 911 operator describing events as they are actually happening are not testimonial if their purpose was to provide the police with information necessary to resolve a present emergency and they were made in an environment that was not tranquil or safe. (*Davis, supra*, 547 U.S. at pp. 827–828.) In this circumstance, the 911 caller's statements are not " 'a weaker substitute for live testimony' at trial" because "[n]o 'witness' goes into court to proclaim an emergency and seek help." (*Id.* at p. 828; see *People v. Cage* (2007) 40 Cal.4th 965, 984 [56 Cal.Rptr.3d 789, 155 P.3d 205] [testimonial statements are statements that are "out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial"].)

■ Similarly, statements in response to police inquiries at the crime scene are not testimonial if the inquiries were designed to ascertain whether there was an ongoing threat to the safety of the victim, the officers, or the public. (See *Davis, supra*, 547 U.S. at pp. 829, 831–832; *People v. Romero* (2008) 44 Cal.4th 386, 422 [79 Cal.Rptr.3d 334, 187 P.3d 56].) For example, questioning a victim to identify a perpetrator for purposes of immediate apprehension of the perpetrator for safety reasons does not yield a testimonial statement. (*People v. Romero, supra*, at p. 422 [statements "are nontestimonial if the primary purpose is to deal with a contemporaneous emergency such as assessing the situation, dealing with threats, or apprehending a perpetrator"].)

In *Romero*, the court concluded a victim's statements to the police at the crime scene were nontestimonial under circumstances where the agitated victim described an assault that had just occurred, and a few minutes later identified the perpetrators whom the police found hiding nearby. (*People v. Romero, supra*, 44 Cal.4th at pp. 421–422.) *Romero* reasoned the "statements provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators. . . . The primary purpose of the police in asking [the victim] to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat." (*Id.* at p. 422.)

██ In contrast, statements that are initially nontestimonial may evolve into testimonial statements if the immediate danger has ended and the questioning continues to elicit details about what happened. (See *Davis, supra*, 547 U.S. at pp. 817, 828–829 [following initial nontestimonial statements, 911 caller's statements may have become testimonial once the caller reported that the assailant (her former boyfriend) had driven away and the operator "proceeded to pose a battery of questions"].) Likewise, statements are testimonial if they are in response to police interrogation that occurs after the emergency has been resolved and where there is no immediate need to identify or apprehend a perpetrator. (See *Davis, supra*, 547 U.S. at pp. 829–830.)

For example, the *Davis* court found statements made to an officer responding to a report of a domestic disturbance were testimonial because there were no signs of a current disturbance; the wife stated she was fine; the wife made statements incriminating her husband only during a second conversation when she was interviewed in a room separate from her husband and sometime after the events she described were over; and the officer had the wife write out an affidavit to establish what had occurred previously. (*Davis, supra*, 547 U.S. at pp. 829–832.) The court reasoned that during the second conversation the officer was not seeking information about " 'what is happening' " but rather about " 'what happened' "; the victim was not making a "cry for help" and was not providing information to enable the officers "immediately to end a threatening situation"; and the sole purpose of the interrogation was to investigate a possible crime. (*Id.* at p. 830–832.) *Davis* concluded the statements are "an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination . . . ." (*Id.* at p. 830.)

Similarly, in *Cage*, the California Supreme Court concluded a victim's statement to an officer at a hospital waiting room was testimonial under circumstances where the officer had earlier been to the scene of the crime and observed evidence that could suggest the defendant (the victim's mother) had committed an assault; the victim had been transported to the hospital and was awaiting treatment in the emergency room; and the officer asked the victim to describe what had happened between the victim and the defendant. (*People v. Cage, supra*, 40 Cal.4th at pp. 984–985.) The *Cage* court reasoned that by the time the officer spoke with the victim the incident had been over for more than an hour; the assailant and the victim were geographically separated; and the victim was "in no danger of further violence as to which contemporaneous police intervention might be required." (*Id.* at p. 985.)

*Cage* concluded the officer's "clear purpose in coming to speak to [the victim] at this juncture was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving defendant* as part of an inquiry into possible criminal activity." (*People v. Cage, supra*, 40 Cal.4th at p. 985.) Rejecting an argument that the officer was determining whether further immediate police action might be necessary to apprehend a perpetrator, the court noted the officer did not try to obtain emergency information from the victim when he saw him near the crime scene even though the victim was coherent; at the hospital the officer questioned the victim in a manner that assumed the defendant was the suspect; and there was no indication the officer followed up with what the victim told him by initiating emergency action. (*Id.* at pp. 985–986, fn. 15.)

On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1478 [59 Cal.Rptr.3d 405].) We evaluate the primary purpose for which the statement was given and taken under an objective standard, "considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*People v. Cage, supra*, 40 Cal.4th at p. 984.)

### 2. *Analysis*

Although firefighter Witt was not a police officer, we agree with defendant that he could be an agent of the police for purposes of securing a testimonial statement. (See *People v. Cage, supra*, 40 Cal.4th at p. 987 [court evaluated whether medical doctor was "acting in conjunction with law enforcement" and making inquiries with an "evidence-gathering aim"]; *People v. Vargas* (2009) 178 Cal.App.4th 647, 660 [100 Cal.Rptr.3d 578] [government officers for *Crawford* purposes include those acting " 'in an agency relationship with law enforcement' "]; see also *Davis, supra*, 547 U.S. at p. 823, fn. 2 [court

assumed, without deciding, that 911 operators can obtain testimonial statements because they may "be agents of law enforcement when they conduct interrogations of 911 callers"].)

■ However, we conclude Marquez's statement in the ambulance to Witt was not testimonial. When Marquez made the statement, he was severely injured from a gunshot wound to the stomach, he was lying in an ambulance en route to the hospital, and he appeared to be on the verge of death. These circumstances lack the solemnity and formality associated with a testimonial statement and are far different from, for example, the scenario in *Davis* where the officer separated the wife from her husband and had her write out an affidavit describing the incident. Although the victim in *Cage* was questioned by the police while awaiting treatment at the emergency room, there is no indication the victim (who had been cut with glass) was in jeopardy of dying. Given Marquez's physical condition and the brevity of his response, it is unlikely that a reasonable person would construe his statement as a solemn declaration that could lead to criminal charges if it was deliberately fabricated. Further, a statement consisting of two words in response to a single question, made by a declarant lying close to death in an ambulance, cannot be characterized as an "out-of-court analog[]" of the testimony given by an alert witness while sitting in court. (*People v. Cage, supra*, 40 Cal.4th at p. 984.)

The circumstances also show that at the time of Witt's inquiry, the shooting had just recently occurred and the shooter was still unidentified and at large.[9] Although Marquez was no longer in immediate danger from the shooter, there was still a possibility that the unidentified shooter could pose an immediate threat to other persons. This is not a case involving a domestic disturbance (as discussed in *Davis* and *Cage*), *where the assailant was identified* and the geographic separation of the victim and the assailant would suggest the immediate threat of danger to both the victim and the public was over. Witt's inquiry about the identity of the shooter was a basic question that was crucial to an evaluation by the police whether there was an ongoing danger to the public. Consistent with this immediacy, Witt communicated the information he acquired to the police that same night, once he had finished his medically related duties and had arrived back at the fire station. Witt's inquiry (in his

---

[9] Although the record of the hearing on admission of the hearsay statement does not reveal precisely how much time had lapsed between the shooting and Witt's questioning of the victim in the ambulance, it suggests a relatively short passage of time (less than one-half hour) based on the fact the authorities arrived at the scene in response to a 911 call; it typically takes about six to 10 minutes to place the victim on a backboard; and Witt asked the question about midway through the 15- to 20-minute ambulance ride. Further, the testimony presented at trial reflects that Officer Smith arrived at the shooting scene about 10:12 p.m.; firefighter Witt spent about eight minutes with Marquez at the scene; and Marquez was removed from the scene sometime before 10:47 p.m.

role as an agent of the police) addressed this concern and was relevant to assist the police in determining whether the at-large perpetrator posed an immediate risk to others.

■ The fact that Witt's inquiry also served to benefit the police in their investigation of the case does not alone render the victim's statement testimonial. The test under *Crawford* is whether the *primary purpose* of the interrogation is to establish facts to be used against the perpetrator. The mere fact that the question might also be expected to ultimately yield evidence against the accused at trial does not transform nontestimonial circumstances into evidence-gathering questioning. (See *People v. Cage, supra*, 40 Cal.4th at p. 984, fn. 14 [the fact that a reasonable person could conceive that an out-of-court statement identifying a perpetrator might later become criminal evidence does not alone establish the statement as testimonial]; *People v. Romero, supra*, 44 Cal.4th at p. 422 ["statements are not testimonial simply because they might reasonably be used in a later criminal trial"]; compare *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. ___ [174 L.Ed.2d 314, 129 S.Ct. 2527, 2532] [lab analyst certificates attesting that substance seized from defendant was cocaine are testimonial because the certificates were made under circumstances indicating they would be available for later use at trial and they were for the sole purpose of providing evidence against the defendant].)

■ In sum, the circumstances here involve an unidentified shooter loose in the community, a single question requesting information relevant to immediate public safety, a two-word response by a victim while he was being rushed to the hospital with a potentially fatal injury, and transmittal of the victim's statement to the police that same night. The highly informal circumstances and brevity of the inquiry concerning a basic question of identity on the night of the incident reflect a response to an immediate situation rather than an investigative purpose. The trial court properly ruled the statement to Witt was nontestimonial, and hence its admission did not violate *Crawford*.

### C. *Spontaneous Statement**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1453.

## DISPOSITION

The judgment is affirmed and the petition for writ of habeas corpus is denied.

Huffman, Acting P. J., and Nares, J., concurred.

Appellant's petition for a review by the Supreme Court was denied March 30, 2011, S189813.