Filed 12/19/24  P. v. Harris CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOHN ALLEN HARRIS,<br><br>        Defendant and Appellant. | A167804<br><br>(Alameda County<br>Super. Ct. No. 22CR012095) |

John Allen Harris appeals from convictions related to shooting at an inhabited dwelling, as well as domestic battery and brandishing a firearm. He argues the trial court erred in admitting hearsay testimony in violation of his right to confrontation, insufficient evidence supports his assault with a firearm conviction, and the court provided the jury a confusing and misleading self-defense instruction regarding his brandishing a firearm charge.  We affirm.

## BACKGROUND

One evening in November 2021, Harris's then-girlfriend, Jane Doe, called 911.  On a recording of the call, they could be heard arguing.  Doe stated, "You pulled a gun out on me," and "You pulled a gun on me, grabbed me by my mother fucking throat."  She then asked the dispatcher, "Yeah I get police help [¶] . . . [¶] He's got a gun and everything."  Doe provided the dispatcher her address and appeared to talk to Harris, saying, "No, you just

1

tried to put a gun on me. You just pulled a gun on me." Doe and Harris continued to argue about their relationship. At one point, Doe stated, "I'm calling police on you. I want to go. I don't never want to see your fucking face." Apparently narrating the events at her home, Doe stated, "[y]ou walking up on me."

In response to the dispatcher's questioning about what happened, Doe stated, "He just grabbed my fucking throat, I did not hit him at all," and "[t]his burns." She again requested police assistance because Harris had a gun. Doe warned him, "Jail. You're going to jail." The dispatcher asked if she required an ambulance and confirmed Harris grabbed her by the throat. After Harris left, Doe gave the dispatcher a description of Harris, his car, and license plate number. An officer who arrived at Doe's house observed she was emotional, quivering, and had dried blood on her neck.

Another night in September 2022, police were notified of ten gunshots fired at Doe's address. Officers with body-worn cameras arrived at the house approximately five minutes later. Doe's mother was visibly upset, repeatedly shouting "[h]e shot at my fucking daughter, my baby baby." Doe showed the officers pictures she took on her phone of a man standing in front of her house just before the gunfire. She told an officer Harris fired the shots at her while she was standing in the window. According to Doe, the shots felt "damn near." Eight bullet holes were found above the garage and underneath the upstairs window of the house. Doe expressed concern that Harris may circle back to her house.

Based on these two incidents, the district attorney charged Harris with shooting at an inhabited dwelling (Pen. Code, § 246, count one; undesignated statutory references are to this code); and assault with a firearm (§ 245, subd. (a)(2), count two); both alleged to have been committed with various

2

aggravating factors and while he was on bail for another offense. The information also charged him with misdemeanor domestic battery (§ 273.5, subd. (a), count three), and misdemeanor brandishing a firearm (§ 417, subd. (a)(2)(B), count four). At the jury trial, Doe and her mother did not testify — the prosecutor was unable to locate them. The trial court admitted the recording of the 911 call under the spontaneous statement exception to the hearsay rule. It also admitted the officer's body-camera footage following the September 2022 shooting. The court determined that neither recording contained testimonial statements and admitting them into evidence did not violate the confrontation clause.

The jury found Harris guilty on all counts and the aggravating circumstances true as to shooting at an inhabited dwelling and assault with a firearm. The court dismissed the on-bail enhancement and sentenced Harris to 20 months in county jail, with credit for time served.

## DISCUSSION

### I.

Harris argues admitting the 911 call recording and the officer's body-camera footage into evidence violated his right to confront witnesses under *Crawford v. Washington* (2004) 541 U.S. 36 because Doe and her mother made testimonial statements in both. The statements, Harris argues, were thus inadmissible because neither witness testified and he did not have an opportunity to cross-examine them. After independently reviewing the statements in the 911 call and the body-camera footage, we disagree. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466 (*Nelson*) [de novo standard of review for assessing testimonial statements].)

Criminal defendants have the right to confront witnesses presented against them. (*Crawford v. Washington, supra*, 541 U.S. at p. 42.)

3

Testimonial hearsay statements cannot be introduced against a "defendant unless the declarant is unavailable, and the defendant had a previous opportunity to cross-examine the declarant." (*People v. Blacksher* (2011) 52 Cal.4th 769, 811.) Hearsay statements that fail to satisfy these criteria are inadmissible under the Sixth Amendment to the United States Constitution. (*Crawford*, at pp. 53–54.) "We evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.' " (*Nelson*, *supra*, 190 Cal.App.4th at p. 1466.)

Statements are testimonial when made in circumstances objectively indicating no "ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822.) Nontestimonial statements are those "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Davis*, at p. 822.) But the existence of an ongoing emergency is merely one factor when assessing the primary purpose of an interrogation. (*People v. Sanchez* (2016) 63 Cal.4th 665, 689, fn. 14.) Other factors include whether the statement was made during an emergency posing a threat to the public or emergency personnel; whether it related to the declarant's medical condition; whether the statement shifted from an emergency to obtaining evidence for trial; and the informality of the statements indicate the purpose was not to obtain evidence for a trial. (*People v. Blacksher*, *supra*, 52 Cal.4th at pp. 813–815.)

4

Objectively viewing the totality of the circumstances, Doe's statements in the 911 call were made to address an ongoing emergency. Doe expressly requested police assistance because Harris had a gun. (*Nelson, supra,* 190 Cal.App.4th at p. 1466.) She said he "just pulled a gun on me." Doe also noted he just grabbed her throat, resulting in a wound that burned. (*People v. Blacksher, supra,* 52 Cal.4th at p. 814 [medical condition of declarant "bears on both the injured declarant's purpose in speaking and the potential scope of the emergency"].) The dispatcher asked Doe several questions assessing her medical condition, seeking observations of the conflict, Harris's description, and a description of Harris's gun — the exact questions necessary for the police "to ' "assess the situation, the threat to their own safety, and possible danger to the potential victim." ' " (*Michigan v. Bryant* (2011) 562 U.S. 344, 376.) It is entirely reasonable to conclude the dispatcher was soliciting information necessary " 'to meet an ongoing emergency,' " not to establish past events for a later criminal prosecution. (*Ibid.*)

Doe's use of the past tense to describe the events does not demonstrate an absence of an ongoing emergency, as Harris contends. Case law does not require the "challenged statements be made while the actual assault is ongoing in order to be nontestimonial." (*People v. Johnson* (2010) 189 Cal.App.4th 1216, 1225.) Rather, "statements made *immediately* after, and in response to, a violent assault should be treated as presumptively made during a contemporaneous emergency." (*Ibid.*) Doe stated Harris *just* pulled a gun on her and *just* grabbed her throat. A reasonable listener would conclude Doe was experiencing an ongoing emergency. (*People v. Brenn* (2007) 152 Cal.App.4th 166, 175.) Harris's assertion that Doe incurred her injury at Harris's house, and the 911 call occurred *after* he had driven Doe back to her house does not demonstrate otherwise. Even accepting Harris's

version of the events, Harris and Doe continued to be in close proximity throughout their argument. Nothing in the record indicates there was a "geographic separation of the victim and the assailant [that] would suggest the immediate threat of danger to both the victim and the public was over." (*Nelson*, *supra*, 190 Cal.App.4th at p. 1467.)

Relying on Doe's statement, "I promise you're going to jail," Harris insists her primary purpose was "to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington,* 547 U.S. at p. 822.) Not so. He concedes the statements were made in the course of a disorganized interview with the 911 dispatcher, interspersed with argumentative statements with Harris. There "was nothing formal, solemn or structured about the colloquy." (*People v. Brenn, supra*, 152 Cal.App.4th at p. 177.) Rather, the "dispatcher was primarily concerned with what was happening at the moment, as opposed to what had happened in the past" — trying to elicit information to assist Doe "and the responding officers, not secure a conviction in a court of law." (*Ibid*.) The fact that the 911 call ultimately yielded evidence used in Harris's trial "does not transform nontestimonial circumstances into evidence-gathering questioning." (*Nelson*, *supra*, 190 Cal.App.4th at p. 1468 ["The test under *Crawford* is whether the *primary purpose* of the interrogation is to establish facts to be used against the perpetrator"].) In sum, Doe's statements during the 911 call were nontestimonial.

The statements Doe and her mother made on the September 2022 body-camera video footage were likewise nontestimonial. There was an ongoing emergency when officers were questioning Doe and her mother. Officers arrived at Doe's house approximately five minutes after gunshots were fired. Doe and her mother immediately told officers Harris shot at Doe and Doe's

6

seven-year-old brother while they were standing at the window. Doe provided the officers a description of Harris. These statements supplied the officers "information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators." (*People v. Romero* (2008) 44 Cal.4th 386, 422.)

Indeed, it became clear over the course of their conversation that Harris continued to pose a threat to Doe. (*Nelson*, *supra*, 190 Cal.App.4th at p. 1464 [statements made "in response to police inquiries at the crime scene are not testimonial" since "the inquiries were designed to ascertain whether there was an ongoing threat to the safety of the victim"].) She expressed concern he might circle around the block and return to the scene of the shooting. Officers asked for a description of his vehicle, including the license plate number. They tried to determine his motive in shooting at Doe and the house — doing so was relevant to understanding the scope of the emergency and the likelihood of him returning. (*Ibid.* ["questioning a victim to identify a perpetrator for purposes of immediate apprehension of the perpetrator for safety reasons does not yield a testimonial statement"].) That Doe attempted for several minutes to transfer to the officers a video she recorded of Harris and his car just before the shooting did not transform the police interview to obtaining evidence for trial, as Harris contends. Harris, the shooter, was loose in the community and a video documenting his appearance would be helpful for police efforts to identify and apprehend him. (*Nelson*, at p. 1467 [inquiring about identity of a shooter is crucial information for police to determine whether there is an ongoing danger to the public].)

Moreover, the circumstances under which Doe's and her mother's statements were made "lack the solemnity and formality associated" with

7

testimonial statements. (*Nelson, supra,* 190 Cal.App.4th at p. 1467.) Officers immediately responded to a notification of gunshots and encountered two agitated victims. They made their statements while still acting under the stress of the shooting. Doe's mother was visibly shaken and upset, exclaiming Harris "shot at my fucking daughter, my baby baby." After Doe gave officers a description of the individuals involved with the shooting, her mother again exclaimed, "John Harris" had "just shot at my fucking house." Throughout the recording, the officers attempted to ascertain what had occurred, trying to view the video on Doe's phone, while her mother excitedly interjected statements regarding the events and her opinion about Harris. These statements are not comparable to testimony "by an alert witness while sitting in court." (*Ibid.*)

The trial court properly concluded the statements on the body-camera footage were nontestimonial. Thus, we do not consider whether admitting the 911 call or the body camera footage was prejudicial.

## II.

Harris contends there was insufficient evidence to support his assault with a firearm conviction. He argues there was no evidence this conduct was likely to injure Doe because he pointed the gun at her house, not her. We disagree.

A challenge to the sufficiency of the evidence supporting a conviction requires reviewing the entire record in the light most favorable to the judgment for substantial evidence — "evidence that is reasonable, credible, and of solid value" — from which a jury could reasonably find the defendant guilty beyond a reasonable doubt. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We presume the existence of every fact the jury could reasonably infer from the evidence to support the judgment. (*Ibid.*)

8

Assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another," an offense that is aggravated if committed with a firearm. (§§ 240, 245, subd. (a)(2).) Assault is a general intent crime — it requires no specific intent to cause harm "because the assaultive act, by its nature, subsumes such an intent." (*People v. Williams* (2001) 26 Cal.4th 779, 786; *People v. Chance* (2008) 44 Cal.4th 1164, 1167.) A defendant must have "(1) willfully committed an act which by its nature would probably and directly result in the application of physical force against another and (2) was aware of facts that would lead a reasonable person to realize this direct and probable consequence of his or her act." (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186–1187.)

Viewed in the light most favorable to the judgment, substantial evidence supports Harris's assault conviction. Firing a "gun in the vicinity of others has been found, under appropriate circumstances, to be sufficient to justify a charge of assault." (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 207–208, 211 [substantial evidence supported assault conviction where defendant intentionally pointed a firearm in the direction of others during a confrontation].) Harris was upset with Doe because he discovered all his clothes outside of his car, which was parked outside of Doe's house. Someone damaged his car by writing on it. Harris knew Doe was standing at the window in her house, and he deliberately fired his gun in her vicinity. He concedes he discharged his gun at a close range. Doe felt the gun shots were "damn near" her. There were bullet holes on the side of the house — eight bullet holes above the garage and underneath the upstairs window of the house. Harris was consequently "aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and

9

probably result from his conduct." (*People v. Williams*, *supra*, 26 Cal.4th at p. 788.)

Relying on the trial court's statements made during sentencing — "I do not believe that the defendant was actually trying to harm or shoot the victim" and "he easily could have hit if he was trying to actually harm [Doe]" — Harris argues he did not fire the gun in a manner that could strike Doe. Leaving aside that the jury, not the court, was tasked with determining whether the prosecution proved he committed an assault with the firearm, an assault conviction does not require any specific intent to injure a victim. (*People v. Williams*, *supra*, 26 Cal.4th at p. 788.) And even if he honestly believed his firing the gun in the direction of Doe "was not likely to result in a battery," this subjective belief is irrelevant. (*Id.* at p. 788, fn. 3.) Regardless of his intent, a reasonable person would conclude directly firing a gun towards a person "by its nature will probably and directly result in the application of physical force." (*Id.* at p. 790; *People v. Carmen* (1951) 36 Cal.2d 768, 775 [it is "an assault, *without regard to the aggressor's intention*, to fire a gun at another or in the direction in which he is standing"].) Substantial evidence supported Harris's assault conviction.

## III.

Harris contends the trial court provided the jury with an improper self-defense instruction regarding his brandishing a firearm charge. According to Harris, that offense penalizes the threat of force, not the *use* of force. Thus, he continues, the court improperly instructed the jury that he is not guilty of that offense if he "reasonably believed that the immediate use of force was necessary to defend against" the imminent danger of being touched unlawfully, and that he was entitled to use "that amount of force that a reasonable person would believe is necessary in the same situation"— the

10

CALCRIM No. 3470 instruction given at Harris's request. This instruction, Harris argues, improperly directed the jury to focus on his entitlement to the *use* of force rather than the *threat* of force required to defend himself. Thus, Harris argues, we must reverse that conviction.

We disagree. Even assuming error — which we do not find — it was harmless under any standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [state standard for assessing prejudicial error is whether "it is reasonably probable that a result more favorable . . . would have been reached in the absence of the error"]; *Chapman v. California* (1967) 386 U.S. 18, 24 [federal standard that error was harmless beyond a reasonable doubt].) The evidence established Harris brandished a firearm while arguing with Doe in November 2021. During the recorded 911 call, Doe repeatedly noted Harris had just drawn a gun on her. (§ 417, subd. (a)(2) [criminal liability for drawing or exhibiting a firearm, whether loaded or unloaded, in a rude, angry, or threatening manner].) During their conversation about his gun, Harris is recorded stating, "I been pulling my shit out," admitting he drew his gun. Harris did so in a threatening, angry, or rude manner — this occurred during a heated argument, prompting Doe to call 911 for police assistance. (*Ibid*.)

Moreover, the jury could not have determined that Harris brandished the firearm to protect himself against Doe. He did not present a self-defense theory at trial regarding his brandishing charge, rendering any self-defense instruction inapplicable. (Cf. *People v. Burney* (2009) 47 Cal.4th 203, 246 [defendant has right to instruction that pinpoints a defense theory].) At no time did he testify that he drew and exhibited a firearm in response to any immediate threat of bodily injury from Doe. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [self-defense requires "the defendant must actually and reasonably believe in the need to defend"].) Rather, he expressly denied

11

threatening Doe with a gun. He explained that, while Doe had a physical altercation with him earlier that evening, he never intentionally scratched her or saw any scratches, and he did not pull out a gun. His defense counsel never argued he engaged in self-defense with regard to the brandishing charge. Thus, the record lacks specific facts supporting any self-defense instruction in the first instance. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823.)

The trial court instructed the jury on the elements for brandishing a firearm and that the prosecutor must demonstrate the elements beyond a reasonable doubt, and it told the jury "[s]ome of these instructions may not apply depending on your findings about the facts of the case." (CALCRIM No. 200.) Given the above, the self-defense instruction did not apply, and we presume the jury adhered to the court's instruction that it was not required to apply it here. (*People v. Avila* (2006) 38 Cal.4th 491, 574.) The instruction as given did not result in any prejudice and reversing the conviction is unnecessary. (*People v. Saddler* (1979) 24 Cal.3d 671, 684 [error not prejudicial where, in part, jury was instructed to " 'disregard any instruction which applies to a state of facts which you determine does not exist' "].)

## DISPOSITION

The judgment is affirmed.

_____
RODRÍGUEZ, J.


WE CONCUR:


_____
TUCHER, P. J.


_____
FUJISAKI, J.


A167804; *People v. Harris*