Filed 11/24/20  P. v. Goodwin CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>HERBERT DEON GOODWIN, JR.,<br><br>  Defendant and Appellant. | F076578<br><br>(Super. Ct. No. F17903887)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Edward Sarkisian, Jr., Judge.

Ahrony, Graham, & Zucker and Ian Thomas Graham for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Herbert Deon Goodwin, Jr. appeals his convictions on seven counts related to allegations of human trafficking and operating as a pimp to two different women, one a minor.  The first three counts, relating to adult victim S.M., consisted of

pimping (Pen. Code, § 266h, subd. (a) [count 1])[1], pandering by encouraging (§ 266i, subd. (a)(2) [count 2]), and human trafficking to commit another crime (§ 236.1, subd. (b) [count 3]). The final four counts, relating to the minor victim A.J., consisted of pimping a minor over 16 years of age (§ 266h, subd. (b)(1) [count 4]), pandering by encouraging a minor over age 16 (§ 266i, subd. (b)(1) [count 5]), and two counts of human trafficking of a minor for a sex act (§ 236.1, subd. (c)(1) [count 6]; § 236.1, subd. (c)(2) [count 7]).

In this appeal, appellant raises three arguments related to the introduction of potential hearsay evidence. For two of these issues, the evidence introduced consisted of statements A.J. made to officers when they responded to her call for help. Since A.J. did not testify at trial, appellant contends introducing these statements violated his constitutional right to confront his accuser and, more generally, his due process rights in a way that affected his conviction on all counts. In the third argument, appellant alleges there was insufficient proof of A.J.'s age to sustain his conviction on counts 4 through 7 because, aside from the contested testimony just noted, where she said she was 17 years old, the only evidence of A.J.'s age was her driver's license, a document appellant contends was improperly admitted hearsay. Appellant also raises a separate contention related to his attempted impeachment of A.J.'s statements to the police. Specifically, appellant contends the trial court erred by permitting him to introduce only one instance of prior false statements of sexual assault and contends he should have been permitted to introduce the more than a dozen statements he had uncovered.

We find no reversable error in the underlying proceedings and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 6, 2017, around 8:00 p.m., Fresno police received information relayed to them from the Las Vegas Police Department about a potential call for help made to a

---

[1] All future statutory references are to the Penal Code, unless otherwise stated.

human trafficking hotline. The Las Vegas Police Department had traced the number used to call the hotline and determined the call had been made from Fresno, not Las Vegas. The police believed the caller had been kidnapped.

The caller had originally identified herself as Kay Underwood. Police first investigated the location where the trace showed the call had been placed, but were unable to locate anyone in need. They then called the number associated with the call. On the first attempt, someone answered, but immediately hung up. On the second, a woman answered. Police asked if she was Kay Underwood and whether she was safe. The woman confirmed her identity and stated she was on a date. She asked the officer if he wanted to meet. The woman provided a description of her clothing and hair, and stated she was staying at a motel near Blackstone and Ashlan.

Police then went to the motel to contact the caller. There, they saw a woman in the parking lot of the motel, matching the description they had been given, and contacted her. The initial interactions with the caller were recorded by a body camera. In the video and audio, the woman identified herself as A.J., said she was 17, and her birthday was in January 2000. Police asked her if she had called under a different name and she confirmed she had called the hotline as Kay Underwood. Her demeanor was described as stand-offish and nervous and she asked whether she and the officers could "get out of here," stating, "I really don't want to get caught." On the way to the police car, she was asked what she was doing there. She responded, "My pimp." At the car, after a few questions concerning whether she possessed any weapons or anything illegal, she was told she was not under arrest. She gave the officers the key to the motel room where she was staying. She told them where she lived and how long she had been a runaway. She stated she had called the human trafficking hotline a few weeks before. She stated she was on medications for depression. The police asked if she was injured or needed medical attention. The police explained they were there to help her and she was not in

3.

trouble. In response A.J. stated, "He's going to kill me!" A.J. was placed in the back of a police car, where she began to cry.

In response, the police explained they could protect A.J. and began asking questions about where her pimp was and how she contacts him. With the body camera turned off, police asked if A.J. knew the name of her pimp. She stated she did not, but described the car he drives and stated he would be calling her soon. The police did not ask follow-up questions about A.J.'s activities or about her pimp, believing that would occur later.

About 45 minutes after describing her pimp's car, a car matching that description drove into the parking lot. At that time, A.J. began to cry heavily and eventually confirmed the driver was her pimp. Appellant was arrested. A.J. was taken to the Child Protective Services Department.

A few days later, on April 10, police conducted an hour-plus interview with A.J. at her school to gather the information necessary for a proper human trafficking investigation.

Subsequent investigation showed appellant had rented two rooms at the motel where A.J. was located. This information led the police to identify an adult woman named S.M. S.M. testified at appellant's trial. She stated she had been in a relationship with appellant since 2016, during which time he had beaten her and worked as her pimp. S.M. explained that appellant would keep the money she earned and took possession of her belongings, including her identification and her mother's ashes.

Additional evidence collected included a cell phone appellant procured for A.J. that contained semi-nude pictures of A.J. and that had been used to connect with appellant's cell phone 70 times between April 6 and April 7. Copies of these pictures, and other similar photographs were also found on appellant's cell phone. A laptop connected to appellant also appeared to have accessed sites used for prostitution and uploaded at least one image which appeared to depict A.J. at the motel where she was

4.

located. Another laptop found in a storage unit rented by appellant contained additional evidence of prostitution advertisements. Also, in the storage unit were personal items and paperwork belonging to S.M. Additional electronic evidence connected appellant to multiple advertisements for prostitution involving S.M. and occurring at the motel where A.J. was located. Finally, multiple text messages between appellant and S.M. were introduced showing him directing her activities as a prostitute.

### *Relevant In Limine Rulings*

As noted, A.J. did not testify at trial. This was apparently due to A.J.'s behavior at the preliminary hearing, where her testimony was ultimately stricken. As a result, the prosecution filed a motion in limine to introduce the body camera footage and a transcript of the conversation between A.J. and the police the night she called the human trafficking hotline.

Following a lengthy Evidence Code section 402 evidentiary hearing, which included the initial investigating officers' testimony and introduction of the body camera video and transcripts as evidence, the court ruled the proffered testimony was admissible. First, the court reviewed the prior preliminary hearing transcript and found it demonstrated A.J. was unavailable to testify. The court noted A.J. had refused at that time to continue answering any questions posed to her and that the parties responded with a stipulation to strike her testimony. Turning next to whether A.J.'s statements to police were testimonial, as recorded on the body camera, the court concluded they were not. Specifically, after reviewing the relevant case law, the court determined the statements were not testimonial because the officers were responding to an emergency and seeking only to determine the identity of the person causing A.J.'s fear. The court further concluded there was no formality in the giving or receiving of the relevant statements and, thus, the primary purpose in questioning A.J. and receiving her statements was with "respect to a contemporaneous emergency rather than to produce evidence about past events for possible use at trial."

Appellant also filed a motion in limine related to A.J. Anticipating A.J.'s statements may be admitted at trial, appellant sought to impeach those statements through evidence of prior false statements of sexual assault under Evidence Code section 1202, as a prior inconsistent statement. According to appellant, A.J. made at least 18 false claims of sexual assault between 2013 and 2017. Appellant's motion focused upon a set of accusations that were included in nine attachments to the motion. Appellant sought to introduce all the accusations in the nine attachments at the trial. The People opposed, arguing that not all of the claims were proven to be false, not all related to the scope of potential hearsay that may be admitted, and that introducing all of them would constitute an undue use of time and serve to confuse the jury.

After extensive argument, the court ruled that only the most recent of the allegedly false statements could be introduced at trial and, then, with the additional limitation that references to prior prostitution or prior complaints could not be introduced. The court first explained that under Evidence Code section 1161, "evidence of the sexual history or history of any commercial sex acts of a victim of human trafficking" was "inadmissible to attack the credibility or impeach the character of the victim." However, the court noted that evidence of prior false statements was admissible. Reviewing the nine attachments, the court stated that "their admission, when considering the probative value, will necessitate undue consumption of time, confuse the issues and mislead the jury" given the limited testimony from A.J. that would be admitted. Further, the court found "admission of all attachments, 1 through 9, would also confuse the issues," given they reflect a history of commercial sex acts and a finding by a dependency court judge. Thus, balancing the probative value against the risks identified, the court concluded that in its discretion it would "allow only the most recent [statement] as reflected in attachment 9, relating to January 2017" concluding it "seems fair and appropriate to allow the latest and most recent alleged false claim."

*Appellant's Trial and Conviction*

At trial, consistent with the in limine ruling, the People introduced the body camera footage and transcript. Additional information about the investigation was introduced by police investigators. Background information about A.J. was introduced through her social worker in the foster care system, who stated her job was to work with minor wards of the court, that she was A.J.'s social worker, and that A.J. had an extensive history of mental illness and self-harm, as well as a history of multiple false allegations of sexual assault. The social worker also confirmed A.J. had refused to testify at the prior preliminary hearing.

Appellant testified on his behalf, denying any allegations he persuaded or forced either A.J. or S.M. to engage in prostitution or profited from their acts. Appellant admitted to providing A.J. with a phone but denied knowing about any pictures taken on it and denied ever receiving photographs of A.J. Appellant also stated he did not remember texting S.M. about her prostitution activities.

Ultimately the jury convicted appellant on all seven counts and found the allegations related to the use of force or fear and the existence of a prior conviction to be true. Appellant received a 15-year-to-life indeterminate term on count 7, and a consecutive 20-year term on count 3. Appellant's sentences on the remaining counts were stayed. Ultimately, with all enhancements, appellant received a term of 36 years to life. This appeal timely followed.

## DISCUSSION

Appellant raises several claims, some of which are partially related. These claims mostly center around the admission of video footage and the related transcript from A.J.'s initial interactions with police. Appellant contends his Sixth Amendment right to confront witnesses and his related due process rights were violated when the evidence was introduced. Appellant also argues that the court improperly excluded evidence of false prior sexual assault allegations made by A.J. that he desired to use to impeach the

7.

improperly admitted video evidence.  Finally, on the premise that the video evidence was improperly admitted, appellant contends additional documentary evidence of A.J.'s age was erroneously admitted and that, without such evidence, there was not sufficient evidence to convict him of charges requiring proof that A.J. was a minor.  We take each in turn.

A.  *Appellant's Confrontation Claim*

Appellant's core arguments in this case turn on the admission of A.J.'s statements to police as reflected in the body camera video and related transcript.  In his first argument, appellant contends introducing this evidence violated his "Sixth Amendment right to confront and cross-examine the witnesses against him under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*)."  Ultimately, this argument turns on whether the statements admitted qualify as testimonial under the *Crawford* analysis.  We conclude they do not.

*Standard of Review and Applicable Law*

"The Sixth Amendment to the federal Constitution guarantees a defendant's right to confront adverse witnesses.  [Citation.]  In addition, the prosecution may not rely on 'testimonial' out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination."  (*People v. Harris* (2013) 57 Cal.4th 804, 839–840; see *Crawford, supra,* 541 U.S. at p. 59.)  Under the federal confrontation clause jurisprudence, as interpreted by our Supreme Court, at least two factors must be considered to determine whether a statement is testimonial.  "First, to be testimonial the statement must be made with some degree of formality or solemnity.  Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution."  (*People v. Dungo* (2012) 55 Cal.4th 608, 619.)  However, "[i]t is evident that Sixth Amendment jurisprudence following the Supreme Court's decision in *Crawford v. Washington* . . . remains in considerable flux."  (*People v. Bryant* (2014) 60 Cal.4th 335, 395.)  Indeed, courts have spent significant effort collecting and

summarizing the various permutations of the doctrine.  (See, e.g., *People v. Barba* (2013) 215 Cal.App.4th 712, 714–733.)

Our Supreme Court has identified at least six principles from the relevant case law.  "First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial.  Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony.  Third, the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial.  Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.  Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses.  Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial."  (*People v. Cage* (2007) 40 Cal.4th 965, 984 (italics & fns. omitted).)

In practical applications, "statements in response to police inquiries at the crime scene are not testimonial if the inquiries were designed to ascertain whether there was an ongoing threat to the safety of the victim, the officers, or the public.  [Citations.]  For example, questioning a victim to identify a perpetrator for purposes of immediate apprehension of the perpetrator for safety reasons does not yield a testimonial statement."  (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1464 (*Nelson*).)  "In contrast, statements that are initially nontestimonial may evolve into testimonial statements if the immediate danger has ended and the questioning continues to elicit details about what happened.

[Citation.] Likewise, statements are testimonial if they are in response to police interrogation that occurs after the emergency has been resolved and where there is no immediate need to identify or apprehend a perpetrator." (*Id.* at p. 1465.)

"On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation. [Citation.] We evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.' " (*Nelson*, *supra*, 190 Cal.App.4th at p. 1466.)

" ' " 'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 ….' [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error." ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 873, overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104.)

*A.J.'s Statements Are Not Testimonial*

Appellant argues that the objective circumstances of A.J.'s interactions with the police show they were taken "for the purpose of gathering evidence of a crime and [were] testimonial in nature." Appellant notes the interview primarily occurred while A.J. was sitting in the back of a police car and cites police testimony that "first responding officers will try to get as much information as we can, get, as much of a detailed statement as we can," which is later followed up on by detectives. Appellant contends the facts surrounding the interview and the officer's view of its purpose demonstrate that the statement was testimonial in nature. We do not agree.

A full review of the body camera interview and the officers' testimony concerning the event demonstrate this case is more like those cases involving questions posed during an emergency than those cases dealing with more formal statements. The police were searching for a human trafficking victim who had called a hotline seeking help. They had limited information about the person's appearance and had been given a false name.

Upon locating the potential victim and asking basic identity questions, the person they were speaking to expressed concern about remaining in a public space and indicated she feared for her life. In response, the police asked a limited and specific set of questions designed to identify who was causing that fear in their victim. Notably, while it may generally be the intent of police in this situation to get as much information as possible, the record does not show the police made such an attempt here. Police asked no questions about past sexual activities, where she may have been trafficked, or how she came into her circumstances. Rather, they asked specific questions about how to identify the person she claimed would kill her.

Although the situation is different in nature from the immediacy of a domestic violence call or other similar situations in the case law, the crime of human trafficking is not so different that the initial contact with a potential victim stating a current fear of harm should be deemed sufficiently formal and lacking in emergency to warrant application of the confrontation clause. Here, at least as reflected in the body camera transcript that was introduced and related testimony, the police were engaged in a process designed to identify and secure a potential victim of human trafficking. Their questions and actions were not designed to identify past facts or build a case, but rather were focused on their need to properly identify the person they were speaking with and respond to her statement of immediate fear. Objectively, the primary purpose of the interactions was to resolve an ongoing emergency and aid in identifying and apprehending an unknown individual purportedly involved in an ongoing criminal activity. The statements introduced were thus not testimonial and, therefore, appellant's right to confront those witnesses against him was not violated by their introduction.

B. *Appellants' Due Process Claim*

As a partial companion argument, appellant contends there is a separate and distinct due process right under the Fourteenth Amendment to confront and cross-examine adverse witnesses that can be violated even if the Sixth Amendment

11.

confrontation right is satisfied. Appellant ultimately relies on *Morrisey v. Brewer* (1972) 408 U.S. 471, 488–489 (*Morrisey*), which concluded that due process protections included a confrontation right in civil administrative parole revocation proceedings where the Sixth Amendment did not naturally apply. (*Morrisey*, *supra,* at p. 481.) The People respond that there is no authority importing a separate and distinct due process confrontation right into criminal proceedings, where the Sixth Amendment provides its protections but that even if such a right did exist, the fact the statements were non-testimonial would preclude a finding of error under case law from civil proceedings. We agree with the People that even if an independent confrontation right exists under the Fourteenth Amendment, it is necessarily narrower in scope than the Sixth Amendment right. Accordingly, where no Sixth Amendment violation exists in a criminal proceeding, no Fourteenth Amendment confrontation violation can exist.

As the Supreme Court explained in *Morrisey*, "the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." (*Morrisey*, *supra*, 408 U.S. at p. 480.) With respect to the right of confrontation in parole revocation hearings, *Morrisey* found the minimum process due was "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." (*Id.* at p. 489.) In *United States v. Comito* (9th Cir. 1999) 177 F.3d 1166, also cited by appellant, the court explained the general test for a confrontation violation in such proceedings as balancing "the significance of the releasee's interest in the right to confrontation" against "the good cause offered by the Government for denying . . . that right." (*Comito*, *supra,* at pp. 1171–1172.)

Notably, in *Comito*, the court was still applying an analysis that looked at whether the relevant statements bore any "particular indicia of reliability." (*United States v. Comito, supra,* 177 F.3d at p. 1171.) This standard was generally rejected as a faithful application of the original meaning of the confrontation clause in *Crawford* when applied

12.

to testimonial hearsay, and eventually fully rejected in *Davis v. Washington* (2006) 547 U.S. 813. (*Crawford*, *supra*, 541 U.S. at p. 60 ["Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. *Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.' "], at p. 68 ["Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."]; *Davis*, *supra*, 547 U.S. at pp. 821–822 ["It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."].)

With respect to California's application of these principles in civil proceedings, courts have found the due process confrontation right both less than that enshrined in the confrontation clause and, yet, still requiring testimonial hearsay to be triggered. In *People v. Nelson* (2012) 209 Cal.App.4th 698, for example, the court considered similar due process confrontation issues in the context of a civil mentally disordered offender act hearing. There, the court explained that "[a]lthough the Sixth Amendment is inapplicable, 'Sixth Amendment cases ... may provide helpful examples in determining the scope of the more limited right of confrontation held by probationers under the due process clause,' " before concluding that because the evidence admitted was not testimonial in nature "the due process right of confrontation does not arise." (*Nelson*, *supra*, 209 Cal.App.4th at pp. 712–713; see also *People v. Johnson* (2004) 121 Cal.App.4th 1409, 1412–1413 [where contested hearsay evidence was not "testimonial" its introduction in probation violation proceedings was subject to state law protections only].) To the extent this issue has previously been raised in criminal proceedings, lack of citation to relevant law and bare reliance on principles from the civil area have been

13.

insufficient to establish a federal constitutional violation. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 813 ["Defendant alleges that the trial court's erroneous admission of the boy's hearsay statement also violated his Fourteenth Amendment right to due process, but fails to provide authority for this proposition, other than his bare assertion that the statement lacked particularized guarantees of trustworthiness. Defendant also fails to explain how a statement's lack of trustworthiness violates the Fourteenth Amendment's due process guarantee. Defendant is unable to establish a federal constitutional violation . . . ."].)

As explained in *Strickland v. Washington* (1984) 466 U.S. 668, 684–685, "[t]he Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment . . . ." Accordingly, we conclude that to the extent a due process right to confront witnesses arises as a separate and independent right from the confrontation clause, that right is necessarily less than that contained in the confrontation clause itself, which defines the full scope of the right in the most critical of situations, the criminal trial. As all forms of the right to confront one's witnesses are triggered upon the introduction of testimonial hearsay, regardless of the scope of the due process right a failure to demonstrate the contested evidence comprises testimonial hearsay precludes a due process claim raising confrontation clause issues. We have previously concluded the statements in this case do not rise to the level of testimonial hearsay and, therefore, reject appellant's claim his due process right to confront witnesses was violated in this instance.

### C. *Exclusion of A.J.'s Alleged Prior False Statements*

Appellant's third argument on appeal contends the trial court erred when it determined, pursuant to Evidence Code section 352 that it would only permit appellant to introduce the most recent incident of alleged prior false statements of sexual assault at trial. Appellant contends the evidence was relevant and admissible under Evidence Code section 1202 and, thus, should have been admitted. Appellant further contends the record

14.

does not affirmatively demonstrate the trial judge properly weighed the potential prejudice against the probative value of each individual accusation. In response, the People contend appellant did not show many of these incidents were admissible in the first instance and, regardless, the trial court did not abuse its discretion in limiting the number admitted at trial.

*Standard of Review and Applicable Law*

Under Evidence Code section 1202, "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

"The trial court has broad discretion in determining whether to admit or exclude evidence under Evidence Code section 352 and its ruling will not be overturned absent an abuse of discretion." (*People v. Carkhum-Murphy* (2019) 41 Cal.App.5th 289, 295.) "As Evidence Code section 352 provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Little* (2012) 206 Cal.App.4th 1364, 1367.)

"[A] trial court vested with [Evidence Code] section 352 discretion must determine probative value, appraise prejudicial effect, and weigh one against the other. The record must affirmatively show the trial judge did in fact weigh prejudice against the probative value. [Citation.] Further, in permitting impeachment, the trial court must explicitly determine the risk of undue prejudice did not substantially outweigh the

15.

probative value.  Where a trial court fails to exercise section 352 discretion in the manner required . . . , error occurs."  (*People v. Navarez* (1985) 169 Cal.App.3d 936, 948.)

*The Court Did Not Abuse Its Discretion*

Reviewing the record in this case, we conclude that even if the evidence offered by appellant is assumed admissible, the record does not suggest the trial court abused its discretion in limiting appellant to introducing only the most recent alleged false report of sexual abuse under Evidence Code section 352.  The record shows the court carefully reviewed the nine attachments detailing the multitude of false statement allegations.  During argument, it delved into the relevance of the complaints, how they would be proven at trial, and whether certain aspects of them must be excluded under other legal principles.  Following this discussion, the court specifically concluded that "their admission, when considering the probative value, will necessitate undue consumption of time, confuse the issues and mislead the jury."  The court also determined "admission of all attachments, 1 through 9, would also confuse the issues," given they reflect a history of commercial sex acts and a finding by a dependency court judge.  Considering these findings, the court determined it proper to admit only the most recent allegation.  This record shows the court properly considered and weighed the relevant factors.  Upon review, its determination to admit only a portion of the evidence offered does not rise to the level of an abuse of discretion.

Appellant further argues the court improperly grouped all the evidence together when it should have conducted an individual analysis for each piece of proffered evidence.  Appellant provides no direct citation for the principle that the court must individually analyze each piece of evidence offered from a group of similar accusations when conducting an analysis under Evidence Code section 352.  Regardless, as shown above, the court engaged in a specific analysis of each piece of proffered evidence, seeking to understand the nature of the underlying accusation and the scope of evidence necessary to present it to the jury.  Its conclusion that only one allegation from the group

16.

should be admitted to prevent confusion and undue consumption of time does not show it failed to review each piece of proffered evidence. Rather, its determination demonstrates a proper balancing considering each piece of evidence in the context of the overall trial. We find no error in that determination.

   D. *Appellant's Sufficiency of the Evidence Claim*

   Appellant's final argument on appeal is that the People failed to prove A.J. was a minor at the time of the relevant charges. Appellant contends there was insufficient evidence on this point because A.J.'s statements to police that she was 17, were improperly admitted as was the only other evidence of her age, her California driver's license. As explained above, we conclude that A.J.'s statements to police were admissible, meaning sufficient evidence of A.J.'s age is properly in the record to support the conviction. We further note that in addition to the two pieces of evidence cited by appellant, additional circumstantial evidence in the form of testimony from A.J.'s social worker, who stated she manages minor wards of the court, was also present. Accordingly, we reject appellant's claim that insufficient evidence supported his conviction on counts 4–7.

## DISPOSITION

   The judgment is affirmed.


                                                              FRANSON, Acting P.J.
WE CONCUR:



PEÑA, J.



SNAUFFER, J.


17.