Filed 7/13/23  P. v. Jackson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTHONY LARUE JACKSON, JR. et al.,<br><br>    Defendants and Appellants. | G060744<br><br>(Super. Ct. No. 21CF1311)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on July 11, 2023, be modified as follows:

1.  On page 1, in the caption, the party designations for "ANTHONY LARUE JACKSON, JR. et al." read "Defendant and Appellant" but it is now changed to read "Defendants and Appellants."

2.  On page 20, delete footnote 8 and replace with the following:

[8] The fourth amended administrative order No. 20/16 required all court users to wear face coverings. (<https://www.occourts.org/media-relations/covid/Fourth_Amended_Administrative_Order_20_16_Required_Safety_Measures_and_Face_Coverings_in_Court-7.30.21.pdf> [as of July 5, 2023], archived at: <https://perma.cc/EZ8S-X6G9>.) On the court's own motion and for good cause, we take judicial notice of the various official acts referenced in this decision. (Evid. Code, § 452, subd. (c).) The trial court distributed coronavirus disease 2019 (COVID-19) safety protocols to all jurors.

The modifications do not change the judgment.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　v.<br><br>ANTHONY LARUE JACKSON, JR. et al.,<br><br>　　Defendant and Appellant. | G060744<br><br>(Super. Ct. No. 21CF1311)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Spolin Law, Aaron Spolin and Jeremy M. Cutcher for Defendant and Appellant Anthony Larue Jackson.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant Marquesah Troycine Fox.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Natasha Cortina and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Anthony Larue Jackson, Jr., and Marquesah Troycine Fox appeal from judgments after the jury convicted them of human trafficking, pandering, and sexual offenses. Jackson argues the following: the trial court erred by admitting evidence; his constitutional rights were violated by the requirement courtroom participants wear face coverings and alternatively he received ineffective assistance of counsel because counsel failed to object; and the matter must be remanded for the court to exercise its discretion pursuant to Senate Bill No. 81 (2021-2022 Reg. Sess.) (SB 81). Fox contends the matter must be remanded for the trial court to exercise its discretion pursuant to Assembly Bill No. 518 (2021-2022 Reg. Sess.) (AB 518) and joins in Jackson's arguments.

Although there was evidentiary error, Jackson and Fox were not prejudiced. None of their other contentions have merit, and we affirm the judgments.

FACTS[1]

Jackson and Fox do not challenge the sufficiency of the evidence to support their convictions. Under established appellate principles, we recite the facts in the light most favorable to the judgment. (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

One afternoon, I.B. was at a bus stop in the City of Highland inhaling a compressed can of air to get high. Jackson drove up in his truck, stopped, and pulled her into the truck. Jackson drove with his left hand and held her with his right hand. When I.B. tried to escape, he repeatedly punched her. He stopped at a liquor store and threatened to shoot her if she moved.

---

[1] Jackson's statement of facts leaves much to be desired. It is 40 pages of witness testimony recited seriatim. An appellant should include only those facts necessary to tell a cohesive story and to address the issues on appeal. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022) ¶ 9:136, p. 9-40 ["do not simply summarize witness testimony seriatim; . . . weave the testimony into an easily understood narrative of what happened"].) Jackson neither tells a cohesive story nor limits the facts to the issues on appeal.

Jackson returned and drove to various locations where he forced I.B. to orally copulate him and he raped her. At some point, her identification card fell out of her bra. Jackson grabbed it and threatened her family if she tried to escape. Jackson gave her a pill and told her it would help with the pain from the beating; it made her sluggish and weak.

Jackson took I.B. to a motel in Ontario. She could not walk because of the effects of the pill and her injuries. He helped her upstairs to the room where Fox was waiting.

Fox told I.B. to take a shower. As she was about to get into the shower, Jackson said, "'If you ever give me or give her any problems,' . . . 'you're going to regret it.'" He punched I.B. multiple times in the ribs. I.B. looked in the mirror—her face was swollen and unrecognizable from Jackson's punches.

After I.B. showered, Jackson and Fox explained "rules" to her. Jackson told her to call him "Daddy." After he left, Fox told I.B. to help her move one of the beds against the door and to sleep on the other bed. Despite her pain, I.B. fell asleep.

Fox woke I.B. up and forced her to perform oral sex—Fox video recorded this with her cell phone. Fox ordered I.B. to continue until she had an orgasm. Fox told I.B. that she was going to orally copulate Fox every night after Jackson left; I.B. did.

After I.B.'s second night in the motel, Jackson returned. He pointed a gun at I.B.'s head and said he would shoot her if she caused any trouble or tried to leave. He told I.B. that she was going to have sex in exchange for money. Fox explained to I.B. how to take care of customers, the different services and prices, and the importance of getting paid first.

Soon after, Fox started servicing clients as a prostitute. Fox told I.B. to stay in the bathroom when she had a client.

3

Once I.B.'s face was sufficiently healed, she started servicing clients. I.B. felt she had no choice because Jackson had threatened her with a gun. She gave Jackson all the money she earned.

At some point, Jackson and Fox took I.B. to Los Angeles. As they were driving, Fox saw S.L. and said, "'Oh, look at her, look at that girl over there.'" Jackson stopped near S.L., and he and Fox tried to talk to her, but she walked away. Undeterred, Jackson and Fox persisted and lured S.L. into the vehicle; she was wearing jeans and a top. S.L. said she wanted to party.

Jackson and Fox took I.B. and S.L. to the motel. In the room, Jackson and Fox told I.B. to go into the bathroom. I.B. heard S.L. crying and moaning. When Jackson and Fox were done, they put S.L. in the bathroom with I.B. S.L. was wearing lingerie. They kept I.B. and S.L. in the bathroom overnight.

The following morning, Fox and Jackson let them out of the bathroom, told them that they were going to have sex in exchange for money, and gave them clothes and makeup. Fox told them "how to suck the [client's] penis" and directed them to get paid first. Jackson told S.L. it was not "a game" and took out a gun and pointed it at her head. I.B. applied enough makeup on her face to cover the bruises. Jackson and Fox forced them to wear lingerie. Fox took pictures and videos of them to use as advertisements.

Clients started to arrive immediately. S.L. took the first two clients while I.B. stayed in the bathroom.

A couple of days later, Jackson and Fox told I.B. and S.L. to have sex with each other. When S.L. refused, Jackson punched her. They forced them to orally copulate each other.[2] Fox videorecorded them. At some point, Jackson ordered them to

---

[2] I.B. also testified Jackson sodomized first S.L. and then her with such force they defecated and he forced them to lick the feces off each other. The jury deadlocked on the forcible sodomy charge as to S.L.

4

insert plastic toothbrush cases into each other's anuses. Fox laughed. Jackson recorded this with Fox's cell phone.[3]

Jackson and Fox started taking I.B. and S.L. to perform out-calls, performing sexual acts at the client's location. Fox provided instructions on what to do, and they gave Fox the money they earned.

Out-calls during the day were followed by in-calls at the motel at night. During in-calls, Fox stayed in the room and explained to clients that she was teaching them how to perform the work. I.B. and S.L. put money in the drawer for Fox to collect and give to Jackson.

During an out-call, S.L. tried to escape but they caught her and told her to get back in the vehicle. Fox screamed at S.L. and smashed a wine bottle on her face leaving what looked like a hole in her eyelid. I.B. tried to stop the bleeding with her sweater.

Jackson and Fox wanted I.B. and S.L. to work. They used Band-Aids and makeup to cover S.L.'s wounds and had her wear her hair over one side of her face to conceal her wounds. I.B. and S.L. had in-call clients that day but they could not do out-calls.

Because S.L. tried to escape, Jackson and Fox hit S.L. and I.B. more and did not feed them. They forced I.B. and S.L. to sleep naked on the floor under the mattress—they had to urinate where they laid. They turned the air conditioning on high and threw water on them. Fox would throw Cheerios under the bed for them to eat. They slept under the bed for three nights. Jackson and Fox forced them to see clients again.

Days later, Jackson and Fox moved I.B. and S.L. to a motel in Anaheim. In the room, Jackson and Fox had I.B. and S.L. get ready for clients, and Fox again made advertisements. Jackson told them to call Fox "Empress."

---

[3]     The video recording was played for the jury.

5

Very early in the morning, Jackson and Fox had sex with I.B. and S.L. During sex, Fox got her period and took a shower. When she returned, S.L. was orally copulating Jackson. Fox was enraged. She argued with Jackson, hit him, and grabbed his gun from the dresser drawer.

I.B. thought they could escape. She grabbed S.L.'s hand and said, "'Let's go.'" They ran out of the motel room and fled toward the lobby. S.L. asked some nearby bikers for help. I.B. kept running.

Police officers arrived around 3:00 a.m. S.L. was distraught, wearing black lingerie, and had a bloody laceration above her eye. S.L. told officers that she had been held captive in a motel room officers learned was registered to Fox. Officers questioned S.L. for about 80 minutes at the motel; the questioning was recorded on body-worn camera (BWC). Officers found S.L.'s picture in multiple prostitution advertisements. Officers found what appeared to be methamphetamine and drug paraphernalia in the room. Officers arrested Jackson and Fox later that day.

I.B. hid until a friend was able to pick her up. Over a month later, she spoke with police.

An amended information charged Jackson with the following: human trafficking (Pen. Code, § 236.1, subd. (b),[4] counts 1 and 14); pimping (§ 266h, subd. (a), counts 2 and 15); pandering by procuring (§ 266i, subd. (a)(1), counts 3 and 16); forcible rape (§ 261, subd. (a)(2), counts 4, 11, and 12); forcible sodomy (§ 286, subd. (c)(2)(A), count 5); forcible oral copulation (§ 287, subd. (c)(2)(A), counts 6, 10, and 17); assault with a firearm (§ 245, subd. (a)(2), count 7); kidnapping to commit forcible rape (§ 209, subd. (b)(1), count 9); and rape by foreign object in concert (§ 264.1, subd. (a), count 13). The amended information alleged kidnapping allegations as to counts 10 to 12 (§ 667.61,

---

[4] All further statutory references are to the Penal Code, unless otherwise indicated.

6

subds. (a), (d)(2)), and multiple victim allegations as to counts 4 to 6, 10 to 13, and 17 (§ 667.61, subds. (b), (e)(4)). The information charged Fox with counts 1 to 3, 10, and 13 to 16 and added assault with a deadly weapon (§ 245, subd. (a)(1), count 8).

Jury trial occurred in August and September 2021 and courtroom participants wore face coverings. The prosecution offered a police officer's testimony regarding the culture and customs of prostitution. She also offered the testimony of the Anaheim motel manager (the manager) who testified generally about check-in procedures and that Fox reserved the room. The manager chose to wear his face covering over his mouth while he testified.

I.B. testified, but S.L. did not. Over Jackson's and Fox's objections, the trial court ruled S.L.'s statements to officers were admissible. During an officer's testimony, the recording of officers' questioning of S.L. was played for the jury. The parties stipulated S.L.'s urine tested positive for marijuana and methamphetamine.

Jackson testified. His defense was I.B. and S.L. were prostitutes who were addicted to drugs and consented to the sex in exchange for drugs or for money to buy drugs. Fox argued similarly.

The jury convicted Jackson of counts 1 to 3, 6 to 7, 10 to 17, and count 9's lesser included offense (§ 207, subd. (a)). It could not reach verdicts on counts 4 and 5, which the trial court dismissed on the prosecution's motion. The jury found true all the allegations, except the multiple victim allegations as to counts 11 and 12. The jury convicted Fox of all counts.

The trial court sentenced Jackson to the low term of eight years on count 1. The court imposed consecutive 15 years to life terms on counts 6, 13, and 17 and consecutive 25 years to life terms on counts 10 to 12. His total prison sentence was 128 years to life. On the remaining counts, the court either imposed concurrent or stayed terms.

7

After considering Fox's cruel and callous conduct against the fact Jackson improperly influenced her, the trial court sentenced Fox to less than the maximum, 24 years[5] in prison as follows:  the middle term of 14 years on count 1; one year as to count 8; two years as to count 10; two years four months as to count 13; and four years eight months as to count 14.  The court imposed and stayed midterm four-year sentences on counts 2 and 3 as they merged with count 1 and counts 15 and 16 as they merged with count 14 (§ 654).

## DISCUSSION

### I. Admission of S.L.'s Statements to Police

Jackson and Fox argue the trial court erred by admitting S.L.'s interview with police officers because they were not spontaneous statements and they were testimonial.  We address each contention in turn.

### A. Background

In its trial brief, the prosecution moved to admit S.L.'s statements to the officers.  The prosecution argued the statements were admissible because they were spontaneous (Evid. Code, § 1240) and did not violate the Sixth Amendment confrontation clause (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*)).  Jackson and Fox moved to exclude S.L.'s statements.

At a hearing, the trial court stated it had watched the BWC video "a few times and looked at the transcript."  The court opined S.L. made her statements under threats and the "stress of excitement" and they were admissible pursuant to Evidence Code section 1240.  The court explained there was no confrontation clause violation because the officers' questions were intended to respond to an ongoing emergency.  The court noted the transcript, 43 pages, was "filled with" questions in a non-formal setting regarding the perpetrators' identity and location, the gun, and the other victim.  The court

---

[5]     Fox's maximum sentence was 30 years.

8

said, "This is a no-brainer to the court." After discussing the various cases, the court noted it reviewed the officers' questions. The court cited to specific pages where officers asked S.L. questions that demonstrated the primary purpose of the questioning was to meet an ongoing emergency. The court opined, "So to suggest this whole conversation wasn't to address an ongoing emergency is far from the facts and far from the truth." The court ruled S.L.'s statements were admissible, and the prosecution played the BWC video recording for the jury. The parties did not transmit the exhibit to this court for our review.

## B. Law and Analysis

In *People v. Sanchez* (2016) 63 Cal.4th 665, 680, our Supreme Court detailed the applicable analytical framework. "In light of our hearsay rules and *Crawford*, a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Ibid*.) We turn to the first step.

### 1. Evidence Code Section 1240

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Hearsay evidence is generally inadmissible unless it satisfies a statutory exception. (Evid. Code, § 1200, subd. (b).)" (*People v. Turner* (2020) 10 Cal.5th 786, 821.) One such statutory exception is the spontaneous statement exception. (Evid. Code, § 1240, hereinafter section 1240.)

9

Section 1240 makes a hearsay statement admissible if it describes an event perceived by the declarant, and "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." For the exception to apply, "'"(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'" [Citation.]" (*People v. Mataele* (2022) 13 Cal.5th 372, 410 (*Mataele*).) To determine whether the speaker was under stress and excitement and unable to contrive and mispresent, we look to "'the passage of time between the startling event and the statement, *whether the declarant blurted out the statement or made it in response to questioning*, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication.' [Citation.]" (*Id.* at p. 411, italics added [speaker's mental state crucial element].)

The application of the exception is a question of fact we review for abuse of discretion. "'"[T]he discretion of the trial court is at its broadest" when it determines whether an utterance was made while the declarant was still in a state of nervous excitement.' [Citation.]" (*Mataele, supra,* 13 Cal.5th at p. 411.)

There is authority, relied on by the trial court here, that stands for the proposition a victim's statements to an officer during a lengthy interview can be admissible pursuant to Evidence Code section 1240. (*People v. Banks* (2014) 59 Cal.4th 1113, 1164 [two-hour interview], overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) But last year, our Supreme Court stated, "We have 'rarely held' that answers to extensive questioning by police officers constitute spontaneous statements. [Citation.]" (*Mataele, supra,* 13 Cal.5th at p. 411.) Nevertheless, deferring

10

to the trial court here on this highly factual question, we conclude it did not abuse its discretion.

The prosecution offered S.L.'s statements for their truth, i.e., as evidence supporting the counts against her. S.L.'s statements therefore were inadmissible unless she made them under a state of nervous excitement.

The trial court indicated it had watched the BWC video of S.L.'s interview several times and reviewed the transcript. The court stated Jackson threatened her with a gun that night and she ran from the motel room minutes earlier to seek help. The court characterized S.L. as "crying," "shaking," "under stress," "real paranoid," and "genuinely scared." It noted S.L. told officers she was afraid for her and her family's safety because Jackson knew where her family lived. This is borne out by the 43-page transcript of the 80-minute interview. At the beginning of the interview, on page 3 of the transcript, S.L. told an officer the man, Jackson, threatened to kill her family. On page 4, she stated he threatened to kill her and her family. Although not entirely clear, this was only about 20 minutes after she escaped. The transcript supports the conclusion the passage of time did not cause S.L.'s nervous excitement to dissipate. Instead it persisted. Later in the interview, toward the end, S.L. told an officer she wanted to call her family to make sure they were okay. Four pages later, she asked how she could make sure her family was safe. On the next page she asked what if he was serious about the threat and headed to her home now.[6] S.L.'s statements, from the beginning to the end of the interview over one hour later, reveal her mental state—she was stricken with fear and worry for herself and her family. Thus, the court did not abuse its discretion by admitting S.L.'s statements pursuant to section 1240. That does not end our inquiry though. As *Sanchez* teaches, although statements may be admissible pursuant to a hearsay exception, they

---

[6]         S.L.'s identification card had a Nevada address.

11

may be inadmissible in violation of the confrontation clause. We next address the second step.

*2. Crawford*

In *Crawford*, the United States Supreme Court held the Sixth Amendment's confrontation clause prohibits admission of testimonial hearsay against a defendant in a criminal trial unless the declarant is unavailable and the defendant had a previous opportunity for cross-examination. (*Crawford, supra,* 541 U.S. at pp. 53-54.) The Court did not explicitly define testimonial statements but described a "core class" of testimonial statements that are the functional equivalent of in-court testimony. (*Id.* at pp. 51-52.)

The Court defined testimonial in *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), and its companion *Hammon v. Indiana* (2005) 546 U.S. 976 (*Hammon*). In these cases, the Court stated the following: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822.) The Court reached opposite conclusions in *Davis* and *Hammon*.

In *Davis*, a domestic violence victim called 911 during an attack and by responding to the operator's questions described what was happening and identified defendant. (*Davis, supra,* 547 U.S. at pp. 817-818.) The Court reasoned these were nontestimonial statements because the victim "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events.' [Citation.]" (*Id.* at p. 827.) It concluded, "[T]he circumstances of [the victim's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." (*Id.* at p. 828.)

12

In *Hammon*, police responded to a domestic violence call and found the victim outside "'"'somewhat frightened,"'"' but she said nothing happened. (*Davis, supra,* 547 U.S. at p. 819.) Inside the home, an officer asked "'what had occurred,'" and she detailed physical abuse by her husband. (*Id.* at pp. 819-820.) The Court concluded these were "easi[ly]" testimonial because "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct" and there "was no emergency in progress . . . ." (*Id.* at p. 829.) The Court contrasted the situation in *Davis* where the operator wanted to determine "'what is happening,' but rather 'what happened.'" (*Id.* at p. 830.) The Court opined it did not matter it was not a formal interrogation at a police station because the statements recounted "how potentially criminal past events began and progressed" and "took place some time after the events described were over." (*Ibid.*)

In *Michigan v. Bryant* (2011) 562 U.S. 344 (*Bryant*), the Court further clarified the testimonial analysis. Police asked a gunshot victim the who, what, and where at a gas station while he was lying on the ground next to his car. (*Id.* at p. 349.) The victim said he was shot at the defendant's house. (*Id.* at pp. 349-350.) The Court focused on the meaning of an "'ongoing emergency'" and whether it "extends beyond an initial victim to a potential threat to the responding police and the public at large." (*Id.* at p. 359.) It first determined courts must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." (*Ibid.*) The court explained the most important circumstance in determining the primary purpose of an interrogation is whether an ongoing emergency exists. (*Id.* at p. 366 [highly context-dependent inquiry].) It added another factor is "the informality of the situation and the interrogation." (*Id.* at p. 377.) "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' [Citation.]" (*Ohio v. Clark* (2015) 576 U.S. 237, 245.)

13

The *Bryant* court stated though these situations are organic. "'[A] conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements.' [Citation.] This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude 'the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.' [Citation.]" (*Bryant, supra,* 562 U.S. at pp. 365-366, fn. omitted.) The *Bryant* court opined that like in *Davis*, the dying victim's statements to police were primarily to address an ongoing emergency and therefore were nontestimonial. (*Id*. at pp. 377-378.)

In *People v. Blacksher* (2011) 52 Cal.4th 769, 813-815, our Supreme Court distilled *Bryant's* analysis into the following six factors to determine the primary purpose of statement: (1) an objective evaluation of the circumstances of the encounter and the parties' statements and actions; (2) whether an ongoing emergency exists or appears to exist; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation evolved from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained. Our review is de novo. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

Here, the trial court erred by admitting the entirety of S.L.'s statements to officers. A somewhat detailed recitation of the interview will illustrate why the court's all or nothing approach fell short.

14

Officers questioning of S.L. lasted about 80 minutes. The transcript of the questioning spans 43 pages. Officers began questioning outside, while she was dressed only in lingerie and eventually covered with a blanket, and continued questioning her in the motel lobby. Four officers actively questioned S.L., and other background voices are noted in the transcript. Portions of the transcript are unintelligible.

Officer No. 1 questioned S.L. about her background information. On page 3 of the transcript, S.L. said the man, i.e., Jackson, threatened her family. The officer said they will take care of it and "I highly doubt these people . . . you know what I'm saying?" S.L. repeated he threatened to kill her and her family. When the officer asked her whether he pointed the gun at her today, S.L. said he slapped her and pointed the gun at her within the past 40 minutes. When S.L. was nonresponsive to the officer's questions, the officer said, "like I'm trying to get the timeline." The officer asked S.L. if she knew the names of the man and woman. After Officer No. 2 asked S.L. a few questions about the woman and the vehicle, Officer No. 1 asked whether the man saw her "wandering the streets two or three days ago" and if an unidentified man was her boyfriend. She said it was a friend (friend), who stranded her.

Officer No. 2 said he would do the rest of the interview. The officer asked S.L. to confirm she was from Nevada and asked how she got to Anaheim. She said her friend stranded her at the airport and the man and woman took her identification and stole her cell phone. The officer asked her how she got to Anaheim and how she met the man. After S.L. said she was walking and they stopped her in Ontario, the officer said "but you live in Las Vegas." The officer asked why she came to Ontario. S.L. said she came with her friend.

Officer No. 3 asked S.L. what she called the man she had been with for the last few days. After she answered, "Daddy," Officer No. 4 asked whether they "got the full story" on this.

15

Officer No. 2 said he wanted to clarify S.L.'s story so they could make sense of it. He said she was in Las Vegas and came to Ontario to meet a guy named Jerry. S.L. replied that she came with Jerry to Ontario. The next two pages, pages 11 and 12, are Officer No. 2 questioning S.L. about her friend, why they went to Ontario, and why he left her there interspersed with questions about how she met the man and the woman and the other victim that ran away. The officer again asked about her friend and why he left her at the airport. When the officer asked S.L. the name of the woman, S.L. started to talk about what the man wanted her to do. The officer said, "[Y]ou're going way to[o] fast as far as like, jumping too far ahead." The officer then asked S.L. where the man picked her up and how he persuaded her to get into the car.

Officer Nos. 1 and 3 asked S.L. whether the man and woman were still in the room and questions about their identity. Officer No. 4 asked whether they were posting advertisements and the identity of the other victim. The officer questioned her about where she was from, how she got to Anaheim, and how she met the man. The officer asked S.L. if she had ever worked as a prostitute before and how many times she was forced to do it. The officer explained there were services for women who were forced to work as prostitutes and asked whether the man forced her to work as a prostitute. S.L. said, "he's raped me."

An unidentified voice asked S.L. what happened to her head. She said the woman smashed a wine bottle over her head. After Officer No. 2 questioned S.L. about the gun, Officer Nos. 3 and 4 questioned S.L. about an advertisement they found online.

Officer No. 2 resumed questioning S.L. on page 25 of the transcript. The officer again started from the beginning, asking how S.L. and her friend got from Las Vegas to Ontario and continued to how she encountered the man and woman. When S.L. started to say they did not want to help her but instead wanted her to work as a prostitute, the officer said, "[Y]ou're still jumping way too ahead . . . ." The officer asked how the man persuaded her to get in the car. The officer asked how the situation escalated, and

16

S.L. said, "[H]e said he was a pimp. So he said he kidnaps girls all the time." The next five pages of the transcript are Officer No. 2 questioning S.L. about getting into their car, where they took her, and what happened at the motel. The officer asked what their instructions were once they got to the motel room. S.L. said, "Like what did they say? Like that they wanted us to hook up with people for money. I feel like I'm being interrogated right now."

Officer No. 2 insisted she was not being interrogated. The officer said, "[T]hese questions is because there is crimes that happened right? That these people did towards you, right? You're the victim of all these things so I need to clarify those things . . . as far as what crimes that they . . . had committed . . . ." The officer continued they needed to control the scene and get into the room. After S.L. apologized for rambling, the officer asked why she felt like she had to stay in the Ontario motel room. The officer questioned her about the other victim and the specifics of the assaults and whether she tried to escape. The officer asked when they brought her to Anaheim. S.L. repeated she was worried for her family. The officer resumed questioning S.L. about the assaults. S.L. said the man forced her to perform oral sex on the woman.

Officer No. 4 returned and asked S.L. to describe the man and woman. Officer No. 2 resumed questioning S.L. about the assaults she endured in the Anaheim motel room. The transcript ends.

From the outset, it does not appear officers believed this to be an ongoing emergency. Officer No. 1 asked S.L. to provide her background information and did question her about the gun. S.L.'s statements indicate she was concerned for her family's safety. But the officer tried to allay her fears by suggesting Jackson and Fox were not the type of people to harm her family. This tends to prove officers believed the threat to the public was minimal. To be fair, Officer No. 1 did question S.L. about the man's and woman's identity. And during the course of the 80-minute interview, other officers interjected and asked S.L. questions about the perpetrator's identity, the motel room, the

17

other victim, advertisements, and the gun to attempt to locate the assailants. Viewed objectively, the primary purpose of these questions was to apprehend Jackson and Fox and end any threat.

But a large portion of the interview was Officer No. 2, and to a lesser extent Officer No. 4, questioning S.L. about past events. What may have started as an interrogation to meet an ongoing emergency soon evolved into an interrogation to prove past events potentially relevant to later criminal prosecution. Officer No. 2 was singularly focused on past events, i.e., S.L.'s friend, how S.L. made it from Las Vegas to Ontario with her friend, how she met Jackson and Fox, how they persuaded her to get into their car, how they ended up in the Ontario motel and what they did to her there, and how they made it to the Anaheim motel and what they did to her. Officer No. 2's questions were solely about past events for potential use at a later criminal prosecution. None of these things concerned an ongoing emergency. Indeed, Officer No. 2 eventually admitted as much when he said crimes were committed and she was the victim. As in *Hammon*, much of the questions and S.L.'s answers are exclusively past-looking pertaining to potential criminal conduct. For example, S.L. said Jackson admitted he was a pimp who kidnapped women, Jackson threatened to kill her if she tried to escape, they directed her to have sex in exchange for money, Jackson raped her, Fox smashed a bottle on her head, and Jackson forced her to perform oral sex on Fox.

To be fair, other officers questioned S.L. briefly about the identity of the man and the woman. In this respect, it is a "no-brainer" *some* of the questions were intended to locate Jackson and Fox. However, it is also a "no-brainer" the majority of the questions and answers were about what happened, not what is happening. Many of the pages the trial court cited to as evidence of an ongoing emergency include Officer No. 2's questions and S.L.'s answers about past conduct. Although officers questioned S.L. at the motel, the interview reads like a stationhouse interview where the officers' primary purpose was to create an out-of-court substitute for trial testimony. Officers told S.L.

18

they needed a timeline and the complete picture, and Officer No. 2 questioned S.L. in a manner that left her feeling like she was being interrogated. Additionally, it does not appear S.L.'s injury was so serious she required immediate medical attention—an officer did not address S.L.'s injury until about halfway through the interview.

The trial court was correct some of S.L.'s answers were admissible. But the court erred by admitting the entire interview because it was not objectively reasonable the primary purpose of all of the interview was to meet an ongoing emergency. As the *Bryant* court teaches, "Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude 'the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.' [Citation.]" (*Bryant, supra,* 562 U.S. at pp. 365-366, fn. omitted.) The court did not do that here, and it erred by admitting the entire interview.

*3. Harmless Error*

Although the trial court erred, the error was harmless beyond a reasonable doubt. (*People v. Jennings* (2010) 50 Cal.4th 616, 652.) Admission of S.L.'s statements did not contribute to the verdict obtained. (*Ibid*.)

Jackson and Fox's argument concerning prejudice is undeveloped. Their argument in its entirety is as follows: "[T]he suspect's conduct against [S.L.] underpinned a number of the charges against [Jackson]. The jury found [Jackson] guilty. This would not have been possible without the lengthy video of [S.L.'s] interview where she gave the full story of what the suspect did to her. [S.L.'s] interview was not cumulative or insignificant evidence, because it was proffered to support discrete charges against [Jackson]." They forget I.B. provided exhaustive testimony concerning each count. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118 (*Ramirez*) [testimony of a single witness sufficient to support a conviction].)

I.B. testified Fox and Jackson deprived S.L. of her liberty through violence, threats, and coercion to commit pimping and pandering (§ 236.1, subd. (b), count 1). Her

19

testimony established they knew S.L. was a prostitute, and S.L. would give them the money she earned committing prostitution (§ 266h, subd. (a), count 2). I.B. provided testimony from which a reasonable jury could conclude beyond a reasonable doubt Jackson's and Fox's sole purpose in picking up S.L. was to procure and intend to influence her to become a prostitute (§ 266i, subd. (a)(1), count 3)—they persuaded her to get into their vehicle, took her to a motel, assaulted her, restrained her overnight, and arranged for her to commit prostitution. She also testified Jackson forced S.L. to perform oral sex on him (§ 287, subd. (c)(2)(A), count 6) and he pointed the gun at her and told her it was not "a game" (§ 245, subd. (a)(2), count 7). She described how after S.L. tried to escape during an out-call, Fox smashed a wine bottle on her face (§ 245, subd. (a)(1), count 8). Finally, I.B. testified, and the jury saw the video recording of Fox and Jackson forcing S.L. and I.B. to insert toothbrush holders into each other's anus (§ 264.1, subd. (a), count 13). Based on this evidence, we conclude admission of S.L.'s interview was harmless beyond all reasonable doubt.

## II. Face Coverings

Jackson and Fox contend their federal and state constitutional rights were violated when the trial court required them, a witness,[7] and jurors to wear face coverings during the trial.[8] Additionally, Jackson and Fox also contend they received ineffective

---

[7] The witness, the manager, chose not to remove his face coverings while testifying.

[8] The fourth amended administrative order No. 20/16 required all court users to wear face coverings. (<https://www.occourts.org/media-relations/covid/Fourth_Amended_Administrative_Order_20_16_Required_Safety_Measures_and_Face_Coverings_in_Court-7.30.21.pdf> [as of **FILE DATE**], archived at: <https: //perma.cc/_____>.) On the court's own motion and for good cause, we take judicial notice of the various official acts referenced in this decision. (Evid. Code, § 452, subd. (c).) The trial court distributed coronavirus disease 2019 (COVID-19) safety protocols to all jurors.

20

assistance of counsel because trial counsel did not object to the face covering requirement. The Attorney General argues they forfeited appellate review of this issue, their contentions are meritless, and trial counsel was not ineffective. We agree with the Attorney General.

A criminal defendant's Sixth Amendment confrontation right includes the right "'"physically to face those who testify against him, and the right to conduct cross-examination."'" [Citations.]" (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 35 (*Alvarez*).) "The central concern of the confrontation clause 'is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' [Citation.] This concern is satisfied when the witness: (1) is physically present for his or her testimony; (2) testifies under oath; (3) is subject to cross-examination; and (4) may have his or her demeanor observed by the trier of fact." (*People v. Bharth* (2021) 68 Cal.App.5th 801, 814.) A defendant's failure to object to an alleged confrontation clause violation forfeits the claim on appeal. (*People v. Arredondo* (2019) 8 Cal.5th 694, 710.) Jackson and Fox forfeited appellate review of this issue when they did not object at trial.

In any event, their contention is meritless. The United States Supreme Court recognized the strong preference for face-to-face confrontation at trial is not absolute and must occasionally give way to important public policy considerations. (*Maryland v. Craig* (1990) 497 U.S. 836, 844, 847-850.) Thus, a defendant's right to confront witnesses may be satisfied without a traditional face-to-face confrontation at trial where "denial of such confrontation is necessary to further an important public policy" and "the reliability of the testimony is otherwise assured." (*Id*. at p. 850.)

Here, the trial court's face covering requirement was necessary to further an important public policy—protecting the health and safety of trial participants during a global pandemic. All the confrontation clause's central reliability concerns remained otherwise assured: witnesses testified in the defendants' and jury's physical presence,

21

witnesses were under oath, and witnesses were subject to cross-examination and observation of demeanor by the trier of fact. True, Jackson and Fox and jurors may have been impeded from observing the manager's full facial expressions because he wore a face covering that covered his nose and mouth. But because they and the jury could hear voice inflection and see his eyes and body language, they could meaningfully observe his demeanor.

Jackson's and Fox's confrontation rights were not violated by the trial court's requirement they and the manager be masked protect against a global health crisis. Other courts have concluded similarly. (*People v. Edwards* (2022) 76 Cal.App.5th 523, 525-527; *People v. Lopez* (2022) 75 Cal.App.5th 227, 230; *Alvarez, supra,* 75 Cal.App.5th at pp. 37-39.) Jackson and Fox offer no reasoned analysis, in fact no analysis, as to why we should depart from this well-reasoned authority.

Jackson and Fox also contend, again for the first time on appeal, that requiring jurors to wear face coverings beginning at jury selection and throughout trial deprived them of their right to an impartial jury.[9] A defendant's failure to object to an alleged impartial jury violation forfeits the claim on appeal. (*People v. Robinson* (2005) 37 Cal.4th 592, 620.) Jackson and Fox forfeited appellate review of this issue when they did not object at trial.

"'"An accused has a constitutional right to a trial by an impartial jury."'" [Citation.]" (*Ramirez, supra,* 13 Cal.5th at p. 1092.) Voir dire is designed to produce a fair jury by revealing and addressing bias in potential jurors. (*People v. Taylor* (2010) 48 Cal.4th 574, 636.) But voir dire itself is not a constitutional right—it "is a means to achieve the end of an impartial jury." (*People v. Ramos* (2004) 34 Cal.4th 494, 512.)

We acknowledge assessing a juror's demeanor can be useful while considering the juror's responses to questions or instructions. However, covering a

---

[9] Unfortunately, the Attorney General does not address this issue. He limits his argument to the confrontation clause issue.

22

juror's nose and mouth does not make it impossible to assess the juror's demeanor. The ability to see a juror's nose and mouth is not essential for assessing credibility. "Demeanor includes the language of the entire body [and] jurors will still be able to observe most facets of the [juror's] demeanor. They can observe the [juror] from head to toe." (*Alvarez, supra,* 75 Cal.App.5th at p. 38 [eyes, top of cheeks, posture, tone of voice, cadence, numerous other aspects of demeanor readily observable].) Jackson and Fox were not denied the constitutional right to an impartial jury by requiring jurors to wear face coverings.

Additionally, neither Jackson nor Fox received ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must establish two criteria: (1) counsel's performance fell below an objective standard of reasonable competence; and (2) defendant was prejudiced, i.e., its reasonably probable there would have been a different result absent the alleged error. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Id.* at p. 697.) As we explain above, there was overwhelming evidence of Jackson's and Fox's guilt. It was not reasonably probable that had Jackson, Fox, jurors, and the manager not wore face coverings the result of the trial would have been different.

III. *Recent Sentencing Legislation*

A. *SB 81*

Jackson asserts we must remand the matter for the trial court to exercise its discretion pursuant to section 1385 as amended by SB 81 (Stats. 2021, ch. 721, § 1), legislation that became effective after the court imposed sentence. Not so.

SB 81 amended section 1385 to provide, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by *any initiative statute*." (§ 1385, subd.

23

(c)(1), italics added.) Subdivision (c)(2) provides the criteria by which the trial court exercises its discretion. The amendments do not help Jackson.

First, section 1385, subdivision (c)(7), states it applies prospectively. Additionally, the jury found true, and the trial court sentenced Jackson pursuant to section 667.61. Proposition 83 prohibits dismissal of the enhancements here under section 667.61, subdivision (g): "Notwithstanding [s]ection 1385 . . . , the court shall not strike any allegation, admission, or finding of any of the circumstances specified in [section 667.61] subdivision (d) or (e)." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 12, pp. 130-131.) The trial court therefore lacks authority under section 1385 to dismiss Jackson's section 667.61 enhancements.

*B. AB 518*

Fox argues we must remand the matter for the trial court to exercise its discretion pursuant to section 654 as amended by AB 518 (Stats. 2021, ch. 441, § 1), legislation that became effective after the court imposed sentence. The Attorney General agrees the legislation applies retroactively to Fox. However, he contends remand is unnecessary because the court intended to impose the maximum possible sentence.

At the time of sentencing, former section 1170, subdivision (b), provided that the choice between sentencing a defendant to the lower, middle, or upper term "shall rest within the sound discretion of the court," with the court to determine which term "best serves the interests of justice." (Senate Bill No. 567 (2021-2022 Reg. Sess.) (SB 567); Stats. 2021, ch. 731, § 13.) SB 567 amended section 1170 to provide that trial courts must impose the lower term (unless contrary to the interests of justice) if certain circumstances contributed to the commission of the offense. (§ 1170, subd. (b)(6).)

At the time of sentencing, former section 654, subdivision (a), required that a defendant who committed an act punishable by two or more provisions of law be punished under the provision that provided for the *longest* possible term. AB 518 amended section 654, subdivision (a), to permit an act or omission punishable under two

24

or more provisions of law to "be punished under either of such provisions." In other words, AB 518 amended section 654, subdivision (a), to give trial courts discretion not to impose the provision providing for the longest term of imprisonment.

The parties agree SB 567 and AB 518 apply retroactively to judgments—like Fox's here—that were not final at the time the legislation took effect. (*In re Estrada* (1965) 63 Cal.2d 740, 745 [Legislature intends ameliorative amendments to apply to every case to which it could constitutionally apply absent evidence of contrary legislative intent]; *People v. Mani* (2022) 74 Cal.App.5th 343, 379 [AB 518 applies retroactively]; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039 [SB 567 applies retroactively].)

The Attorney General asserts remand is unnecessary because the trial court would not have selected the pimping or pandering counts as the principal term instead of the human trafficking count. We agree.

"We are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not [have imposed a different sentence]' even if it had the discretion." (*People v. Jones* (2019) 32 Cal.App.5th 267, 272-273.) We may infer the trial court's intent based on its statements and sentencing decisions. (*Id*. at p. 273.)

At the sentencing hearing, the trial court stated Fox committed callous and cruel acts against vulnerable victims. The court opined that although Fox was surprised when Jackson brought I.B. to the motel, she soon forced her to orally copulate her with a face that looked like a "decompos[ed]" "corpse." The court was particularly disturbed by Fox's treatment of I.B. and S.L. when she made them sleep under the bed. It recognized Jackson was "the heavy" but characterized Fox as the "conductor" who orchestrated the advertisements of I.B. and S.L. When discussing sentencing choices with Fox's trial counsel, the court stated, "The big problem is the human trafficking which carries a range of 8, 14, or 20 years in prison" and "[w]e haven't even talked about the sex stuff yet."

25

Based on the trial court's statements and sentencing choices, we conclude it would not have imposed a different sentence even if it had the discretion. The court's comments indicate its intent was to select the human trafficking counts, count 1 as to S.L. and count 14 as to I.B., as the primary count and stay the sentences on pimping and pandering counts, counts 2 and 3 as to S.L. and counts 15 and 16 as to I.B. Based on Fox's deplorable conduct, it would have been justified in imposing the upper term. But it selected the midterm on both counts 1 and 14 opining "she should not receive the absolute maximum." Based on the court's comments the human trafficking counts were the starting point, we disagree with Fox's assertion that concerning I.B., the court would have selected count 15 or 16 as the principal term and stayed the sentence on count 14 if it had the discretion. Remand is unnecessary.

## DISPOSITION

The judgments are affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.

26