Filed 2/25/25  P. v. Smith CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER SMITH,<br><br>    Defendant and Appellant. | B334659<br><br>(Los Angeles County<br>Super. Ct. No. BA494260-01) |

APPEAL from a judgment of the Superior Court of Los Angeles, Karla D. Kerlin, Judge.  Affirmed.

G. Martin Velez, under appointment by the Court of Appeal for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Melanie Dorian, Deputy Attorneys General for Plaintiff and Respondent.

———————————

Appellant Christopher Smith was charged by information with the attempted murder of Camil McCraw. (Pen. Code,[1] §§ 664 and 187, subd. (a)). He was also charged with assaulting McCraw and Trivone Scott with a deadly weapon (§ 245, subd. (a)(1)). The information alleged four prior convictions qualifying as strike offenses under the Three Strikes Law and eight prior felony convictions.[2]

The jury returned verdicts of guilty on all three counts. The jury also found that Smith had inflicted great bodily injury on McCraw and found three aggravating factors to be true: the crimes were independent of each other, the offenses involved separate acts of violence, and the crimes were committed at different times or separate places. (Cal. Rules of Court, rule 4.425(a)(1)–(3).)

For the attempted murder conviction, the trial court imposed the high term of nine years and tripled that term to 27 years based on two prior convictions. For the assault on McCraw, the trial court imposed an additional three years for the great bodily injury enhancement and sentenced Smith under the Three Strikes Law to a consecutive term of 25 years to life. For the assault on Scott, the trial court stayed the sentence of 25 years to life pursuant to section 654. The court struck two of the

---

[1] Statutory references are to the Penal Code.

[2] Smith sustained the felony convictions between 1999 and 2014. They are grand theft, infliction of corporal injury on a spouse, three burglaries, felon in possession of a firearm, under the influence, and possession of a controlled substance.

prior felony convictions based on Smith's *Romero*[3] motion. The total sentence is 52 years to life plus 3 years.

The principal issue on appeal is whether a statement victim Scott made to the police should have been excluded under *Crawford v. Washington* (2004) 541 U.S. 36.

## FACTUAL BACKGROUND

### I.  **Offenses Against Camil McCraw**

Delilah White and Camil McCraw live in Henderson, Nevada. They were in Los Angeles on March 20, 2021, having driven from Nevada. Camil McCraw was starting a new job and wanted to visit her mother, Mary McCraw,[4] and her sister who lived in Los Angeles.

White, Camil and Mary decided to go shopping. They drove to the Garment District in a rental car. After parking their car on Santee Street, they walked across the street to some stores. (They were on Santee Street between 11th and 12th Street.) They walked down the street to Azzure Couture, a shoe store. It was a small store crowded with about 10 people. White and Camil went inside the store and Mary stayed outside because she does not like crowds.

Mary's back was to the street and she was facing the store. She noticed a man she identified as Smith. He had a backpack which was zipped open with some shoes showing. She noticed he was dragging his foot. He kept pacing back and forth at the front of the store. He was saying hi to the passersby, who paid no

---

[3]      *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[4]      For clarity, we use first names for the McCraws.

3

attention to him.  Mary's impression was that he was trying to sell the shoes in his backpack.  Smith turned around and walked into the store.

In the meantime, in the store White saw a shoe that she liked and grabbed it, intending to tell Camil that she liked the shoe.  Camil was right behind her.  White turned around to look at Camil.  She saw "blood gushing out of her neck."  White saw a male right behind Camil.  She saw the male stab Camil in the lower back with a fixed-blade, 10-inch kitchen knife.  Next, White saw the man run out the open front door.  She noticed that one of his legs was dragging.  Camil fell into White's arms.

Camil did not know she had been stabbed until she saw blood shooting from her neck.  She did not see the person who stabbed her.  All she knew from her peripheral vision was that the attacker was male.

Mary, who was still outside the store, heard screaming and yelling and saw a couple of people run out of the store.  "[A]nd then the defendant ran out, and he had a knife in his hand, and he ran across the street."

Ignacio Perales-Romo owned a store on 11th Street between Santee and Los Angeles streets.  The store sold T-shirts, shoes and backpacks.  About 1:30 in the afternoon on March 20, 2021, Perales-Romo saw a muscular black man wearing a white T-shirt standing by his store.  Twenty minutes later, he saw this man running from Santee Street; the man was agitated and yelled "police, police."  The man grabbed a T-shirt, put it on and dropped the backpack.  Perales-Romo saw a 12 to 14-inch bloody knife fall out of the backpack.  The man grabbed the knife, put it in his backpack, and took off.

4

Camil was hospitalized for four months.  At the hospital, she underwent surgery to repair severed arteries, was in a coma for two months, was on a ventilator (the ventilator paralyzed her right vocal cord) and had two strokes.  The stroke was a sequalae of the injury.  She is blind in her right eye and partially blind in her left eye.  She testified that she had to learn to walk, talk, and eat again.

II.     **Assault Against Trivone Scott**

The next day, March 21, 2021, Christopher McGee, a construction special investigator, was working at the intersection of Flower and 4th Street in downtown Los Angeles.  McGee saw homeless people every day.  While he did not know victim Trivone Scott by name, he recognized him as one of the homeless persons in the area.  Scott was living in a tent nearby.

At approximately 9:00 a.m. on March 21, 2021, McGee was in his truck in a parking structure, charging his phone, when a man walked up and asked for a cigarette.  The man seemed agitated.  The man was black, approximately six feet tall, wearing a red hat, dark blue jeans, and a white sweatshirt with a big red circle on the front and back.  He carried a backpack.  At trial, McGee identified Smith in a photo as the man who asked him for a cigarette.  McGee gave Smith a cigarette and saw him walk into and out of the parking structure.

McGee continued to check his phone and after about 30 seconds, he left his vehicle.  He saw victim Scott hopping around.  Scott was holding his right leg and was grunting with pain.  There was blood coming out of his leg.

McGee told Scott to sit down and lie on his left side.  McGee had a person call 911.  Another person took Scott's belt off and made a tourniquet.

Police Officers Travis Fitzpatrick and Alexander Hebert responded to the 911 call. The call for the officers came in as an "assault with a deadly weapon." The officers responded to what Hebert characterized as "code three emergency call." At the scene, Hebert saw Scott on the ground.

Paramedics arrived. Now came the interchange between Scott and Officer Fitzpatrick that is the subject of this appeal. There is a transcription of the 9:13 a.m. interchange. The transcription was admitted into evidence. It is attached to this opinion.

The interchange was chiefly between Scott and Officer Fitzpatrick. Fitzpatrick asked for Scott's first name and inquired where his assailant had gone. Fitzpatrick tightened the tourniquet and assured Scott that he was there to help and an ambulance was on its way. Fitzpatrick then asked how many times Scott had been stabbed. Scott said he did not know because he had been asleep. There was a short, somewhat inexplicable segment about Scott's girl. Then came the only relatively significant portion of the interchange when Scott tried to quote Smith's statement that this was his tent. Scott also stated he knew his attacker who was "one of these random motherfuckers that we don't know," he did not know the man's name and his attacker had a hoodie and was light-skinned with green eyes.

The police told McGee to give them a call if he again saw the person he had seen in the garage before the stabbing. Around 11:45 a.m. the same day McGee saw Smith walking down Flower Street and called 911.

Officer Hebert responded to McGee's call. Hebert thought that he might be dealing with an armed suspect. He drew his

weapon and proceeded to arrest Smith. Hebert found a 10-inch kitchen knife with blood on it in Smith's backpack.

## DISCUSSION

I. **Scott's Statement Was Not Testimonial under** *Crawford v. Washington*

The fact that Smith's arrest was based on McGee's identification of Smith as Scott's assailant means that the legal significance of Scott's statement to the police is dubious. There is, however, a possibility that Scott's statement corroborated McGee's identification. Accordingly, we will examine whether Scott's statement should have been excluded under *Crawford v. Washington, post.*

### A. Scott Cannot Be Found

The prosecutor detailed efforts to locate Scott. Detective Hernandez, the investigating officer, interviewed Scott in the hospital. However, after Scott was released from the hospital, Hernandez was unable to find or contact Scott. A search of the records showed no warrants out for Scott and Scott was not in custody. Nothing was found in the coroner's database that would indicate Scott was deceased. The search produced a Trivone Scott with a slightly different birthdate, but it turned out that this was not the individual who had been stabbed. Hernandez went multiple times to the site where Scott's tent had been and questioned others in the area about Scott but was unable to develop any leads about Scott. Finally, the Wesley Health Center was contacted. The Wesley Health Center provides services to people on skid row, but the Center had no information about Scott.

Scott was unavailable for the preliminary hearing and trial.

7

B.   Pre-Trial Proceedings About the Interchange
      Between Scott, the Police, and the Paramedics

The People filed a brief asking the trial court to admit the interchange between Scott, the police and the paramedics under Evidence Code section 1240.  This statute sets forth the spontaneous statement exception to the hearsay rule.[5]

Unavailability is not a requirement for the admission of a spontaneous declaration.  (*People v. Anthony O.* (1992) 5 Cal.App.4th 428, 436.)  However, as we discuss below, unavailability is a requirement under *Crawford v. Washington, supra,* 541 U.S. at pp. 53–54.

Smith contended he was entitled to confront the witnesses against him under *Crawford v. Washington.*  He argued that Scott's statements became testimonial when he responded to questions by the police about the suspect who had attacked him.  He contended that the questions from the officers "are to elicit some sort of description to be used in prosecution of anybody that they would detain or arrest as it relates to this case."

The trial court applied the analytical framework set forth in *People v. Cage* (2007) 40 Cal.4th 965, 984, which is set forth in greater detail in *People v. Chism* (2014) 58 Cal.4th 1266, 1289 (*Chism*).  The court found the statement was hearsay but not testimonial, was not made under formal circumstances and was

---

[5]    "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  (Evid. Code, § 1240.)

not given for use at a criminal trial.  The trial court found this was an emergency and the primary purpose of the interchange was to deal with the emergency situation.  The court ruled Scott's statements were not testimonial and, under *Crawford v. Washington* and Evidence Code section 1240, Scott's statements in the interchange were "appropriate" and would be admitted.

Smith's contention that Scott's statement violated the Sixth Amendment is predicated on the proposition that Scott's statement is testimonial.  We independently review whether otherwise admissible out-of-court statements are testimonial such that their admission violated defendant's constitutional right to confrontation.  (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

*Crawford v. Washington* held that the Confrontation Clause of the Sixth Amendment[6] excludes the testimonial statement of a witness who did not appear at trial unless he was unavailable at trial and the defendant had a prior opportunity to cross-examine the witness.  (*Crawford v. Washington, supra,* 541 U.S. at pp. 53–54.)  "Testimony" is a solemn declaration or affirmation made for the purpose of establishing or proving some fact.  (*Id.* at p. 51.)  "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and

---

[6]     "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)

9

that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822.) Not all those questioned by the police are witnesses for purposes of the Sixth Amendment and not all interrogation by law enforcement officers is subject to the Confrontation Clause. (*Chism*, *supra*, 58 Cal.4th at pp. 1288–1289, citing *Michigan v. Bryant* (2011) 562 U.S. 344, 355.)

*Chism* lists six factors to consider in determining whether statements made in the course of police questioning were for the primary purpose of creating an out-of-court substitute for trial testimony that implicates the confrontation clause. "These are (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appeared to present an emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained." (*Chism, supra,* 58 Cal.4th at p. 1289.)

To address the first of these factors, we have attached the transcript of the interchange between Scott, the police and the paramedics because a summary of it does not do it justice. The transcript conveys the frenetic atmosphere of an emergency. The stabbing had occurred only minutes before. The victim was lying

10

on the ground with a belt as a tourniquet for his wound. He was in obvious pain, confused and nearly incoherent. The police had just arrived, having responded to an emergency dispatch, closely followed by paramedics. The conversation, if it can be called that, was disjointed and veered from topic to topic. The police asked questions one would expect of them, which were questions about the perpetrator of the stabbing. While not on record, McGee, who had applied the belt as a tourniquet and had told others to call the police, was also there, momentarily important as a witness and a participant in managing the crisis. In sum, this was a paradigm of a street-based emergency.

Addressing the other factors, there is no doubt that the statement was made during an emergency and in response to the exigencies of the situation. The police clearly perceived appellant to be a threat the public, as shown by the later arrest effected at gunpoint. Scott's medical condition was dire but not life threatening. The statement was made a few minutes after the stabbing. Finally, the statement was made under extremely informal circumstances. An application of the factors set forth in *Chism* shows that Scott's statement was clearly not testimonial.

In *People v. Romero* (2008) 44 Cal.4th 386, the Court concluded that the statements of an unavailable witness were not testimonial. Two officers, responding to a call, arrived at a building on West Sunset Boulevard in Los Angeles. Tony Schmidt, the unavailable witness, came running to the police car. "[Schmidt] was yelling, and very upset." (*Id.* at p. 421.) Schmidt, who was the property manager of the building, had a cut on the little finger of his right hand. (*Ibid.*) Schmidt had confronted two men, one of whom was the defendant, who were spray painting graffiti on the building and told them to stop. One of the men hit

11

Schmidt with a small ax which he pulled from his waistband, cutting Schmidt's little finger. (*Ibid.*) At some point, Schmidt called the police. Schmidt ran to his apartment and got a gun. The men again threatened to attack him. (*Ibid.*) When Schmidt fired three shots in the air, the men fled. (*Ibid.*) The statement Schmidt made to the police covered the foregoing.

Minutes later, both men were found hiding in some bushes; Schmidt identified one of the men as the defendant. Approximately five minutes had elapsed between the time the officers arrived and Schmidt's identification of the defendant. (*People v. Romero*, *supra*, 44 Cal.4th at p. 421.) The Court concluded that Schmidt's statement was not testimonial. (*Id.* at p. 422.)

*People v. Romero* and the case at bar are quite similar in some respects. Both cases displayed hallmarks of an emergency, i.e., police freshly arrived at the scene; an upset and injured victim describing the recent encounter; an absent assailant; police taking steps to evaluate the potential threat posed by the absent assailant; and the very short time between the assault that caused the injury and the statement of the witness. Where *People v. Romero* and the case at bar differ is that Schmidt went to get a gun, got it, and fired it, which is not something that Scott did. Notwithstanding this fact, the Court still concluded that Schmidt's statement was not testimonial.

Appellant contends that "the officers' questioning of Scott elicited testimonial statements from Scott." It is true Officer Fitzpatrick asked Scott how many times he had been stabbed, whether he knew appellant's name and what appellant had used for the stabbing. Officer Fitzpatrick also asked Scott for his first name, told Scott the tourniquet would have to be tightened, told

12

Scott he was trying to stop the bleeding and that it was going to hurt, and assured Scott that an ambulance was coming. The totality of Officer Fitzpatrick's statements do not amount to "questioning" but are statements made in the course of dealing with an emergency, that is, Scott lying on the ground with a tourniquet around his leg and in severe pain.

The claim that Scott did not express any concern that appellant would return does not square with the fact that when Officer Hebert returned to the scene, Hebert considered appellant to be armed and dangerous and drew his gun to effect the arrest. And it is wholly unrealistic to contend that Scott did not express any concern that appellant would return. Scott was clearly overwhelmed by the fact that he had been stabbed and was bleeding. He could hardly spare a thought about what else appellant might do. That Scott's "primary purpose was to prove past events," as appellant contends, is refuted by the agonized tenor of Scott's statements during the interchange. He was in no condition to "prove past events."

Appellant acknowledges that the admission of a testimonial statement by an unavailable witness contrary to the holding of *Crawford v. Washington* may be harmless error. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661, citing *Chapman v. California* (1967) 386 U.S. 18, 24.) However, appellant contends that the error in this case was prejudicial. He contends Scott was the only witness to the stabbing incident and was "the only source of a description of the person who stabbed him."

Appellant has it wrong. Smith's arrest came about as a result of a call placed by McGee. It was McGee who stated he saw a man, i.e., appellant, in the immediate area right before the incident; it was McGee who saw appellant walking down Flower

13

Street about three hours after the stabbing; it was McGee who called the police. Officer Hebert responded to that call and arrested Smith with a bloody knife. If it was error to admit Scott's statement, we find the error not prejudicial.

In sum, not only is Scott statement not testimonial, but if it is testimonial, it was harmless error to admit it into evidence.

II **Scott's Statement Was a Spontaneous Declaration**

Section 1240 of the Evidence Code is the codification of an established common law exception to the hearsay rule. (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is not the nature of the statement but the mental state of the speaker. (*People v. Liggins* (2020) 53 Cal.App.5th 55, 63.) A statement qualifies as a spontaneous declaration if the following requirements are met: (1) there must be some occurrence startling enough to produce a nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent; and (3) the utterance must relate to the circumstance of the occurrence preceding it. (*Poggi,* at p. 318.) Whether a statement falls within the spontaneous statement exception is reviewed for abuse of discretion. (*People v. Mataele* (2022) 13 Cal.5th 372, 411; *People v. Merriman* (2014) 60 Cal.4th 1, 65.)

All three requirements were met in this case. The stabbing sustained by Scott was startling enough to produce a nervous excitement. The exchange between Scott and the police reflect that Scott was certainly excited. Indeed, his statements were at times incoherent and clearly made under the stress of being

14

stabbed. There was certainly no time for Scott to contrive and misrepresent about the stabbing: he had just been stabbed minutes before he made the statements.

Smith contends that Scott's statement was not spontaneous because he was responding to questions asked by the police.

"The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity. Thus, an answer to a simple inquiry has been held to be spontaneous. [Citations.] More detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity. [Citations] But ultimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter." (*People v. Farmer* (1989) 47 Cal.3d 888, 903–904, disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

The questions in this case that pertained to the stabbing, and not to Scott's injuries, were quite simple and were not detailed. Scott was asked whether he knew his assailant, whether he knew his name, whether he had seen him before, and if he knew where the assailant went. These questions could not have dispelled the "nervous excitement" (*People v. Poggi, supra,* 45 Cal.3d at p. 318) evident in Scott at the time he answered these questions. The admission of Scott's statement as a spontaneous declaration was well within the ambit of the trial court's discretion.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

GRIMES, J.

VIRAMONTES, J.